**Edward SAFFRON, Plaintiff,**

v.

**Jerry V. WILSON et al., Defendants.**

**Civ. A. No. 74–79.**

United States District Court, District of Columbia.

Jan. 2, 1975.

Ralph J. Temple, American Civil Liberties Union Fund, Washington, D. C., for plaintiff.

Derek I. Meier, Asst. U. S. Atty., Earl J. Silbert, U. S. Atty., Arnold T. Aikens, Asst. U. S. Atty., Washington, D. C., for defendants.

## MEMORANDUM AND ORDER

WILLIAM B. JONES, District Judge.

This is an action seeking damages and declaratory or injunctive relief for alleged deprivation of plaintiff's constitutional rights under the First, Fourth and Fifth Amendments,[1] mental suffering, and humiliation resulting from his arrest on January 20, 1973, Inauguration Day, in the vicinity of Jackson Place and H

---

1. In *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 390–397, 91 S.Ct. 1999, 2001, 29 L.Ed.2d 619, 623 (1971), the Supreme Court recognized a cause of action for violations of the Fourth Amendment by federal officials. This holding has been interpreted almost unanimously as recognizing a cause of action for damages for violation of any constitutionally protected interest. See *Apton v. Wilson*, 165 U.S.App.D.C. 22, 506 F.2d 83 at 93 (1974); *Marsh v. Kitchen*, 480 F.2d 1270, 1271 n. 2 (2d Cir. 1973); *Sullivan v. Murphy*, 156 U.S.App.D.C. 28, 55 n. 47, 478 F.2d 938, 965 n. 47 (1973); *United States ex rel. Moore v. Koelzer*, 457 F.2d 892, 894 (3rd Cir. 1972); *Bethea v. Reid*, 445 F.2d 1163 (3rd Cir. 1971); *Gardels v. Murphy*, 377 F.Supp. 1389 (N.D.Ill.1974); *Butler v. United States*, 365 F.Supp. 1035 (D.Haw.1973); *Washington v. Brantley*, 352 F.Supp. 559, 564 (M.D.Fla.1972); *Contra, Davidson v. Kane*, 337 F.Supp. 922, 924 (E.D. Va.1972).

Street, N.W., in the District of Columbia. Plaintiff states that he was arrested by Metropolitan Police officers on a charge of "failure to move on," 22 D.C.Code § 1121(2), when he attempted to gain access to the south sidewalk of Pennsylvania Avenue between East and West Executive Avenues, N.W., (the "White House sidewalk") or to the southwest area of Lafayette Park. He further alleges that shortly before his arrest he had been "forcibly escorted" away from the White House sidewalk and away from the southwest area of Lafayette Park by Park Police officers (the "John Doe" defendants). At the time of his arrest, plaintiff alleges that he was wearing a placard protesting certain governmental actions.

Plaintiff further alleges that because he had given a timely and proper notice [2] of his intention to demonstrate on the White House sidewalk on January 20, 1973, and inasmuch as no action had been taken by any governmental official to seek a court order permitting the prevention of his presence there with his protest sign, he had a right to be on the White House sidewalk at that time. *See A Quaker Action Group v. Morton*, 148 U.S.App.D.C. 346, 460 F.2d 854 (1971); *A Quaker Action Group v. Hickel*, 139 U.S. App.D.C. 1, 429 F.2d 185 (1970); *A Quaker Action Group v. Hickel*, 137 U.S. App.D.C. 176, 421 F.2d 1111 (1969).[3]

The government maintains that plaintiff's reliance on *A Quaker Action Group* is unfounded, arguing that its thrust was directed at the enforcement of the "permit" system (30 C.F.R. § 50.19) and not at regulations promulgated pursuant to an independent legislative source of authority, the Inaugural Ceremonies Act of

---

**2.** On November 30, 1972, plaintiff filed with the office of the National Capital Parks a Notice of Proposed Demonstration setting forth his intention to demonstrate on the White House sidewalk during the period of December 15, 1972 through January 15, 1973. Appendix 1 to Lamb Affidavit. By letter dated December 8, 1972, defendant Arthur J. Lamb, Chief, Division of Special Events, National Capital Parks, National Park Service, Department of Interior, advised plaintiff that the area would "be unavailable for [his] activity due to the construction of Inaugural stands." The letter offered plaintiff, as alternative sites for his continued demonstration, "the north side of Lafayette Park, as long as safety permit[ted], or a portion of the Ellipse." Appendix 3 to Lamb Affidavit.

Plaintiff responded by letter dated December 10, 1972, stating that he intended to continue his demonstration on the White House sidewalk as long as that area was not closed to all pedestrians. *Id.* On January 10, 1973, Russell E. Dickenson, Director of the National Capital Parks, responding to plaintiff's letter, again advised plaintiff that the White House sidewalk was unavailable due to the construction of Inaugural stands and "the added congestion and for safety factors." *Id.*

Plaintiff filed another notice on December 29, 1972. Although the "date of proposed demonstration" was given as "continuously from May 26, 1969, on," it would appear that this notice was intended to cover the period from January 15 through February 15, 1973. Ap-

pendix 2 to Lamb Affidavit. As just noted, Russell Dickenson corresponded with plaintiff on January 10, 1973 (after the 12/29/72 notice was filed), but the subject of his letter was plaintiff's proposed demonstration from December 15–January 15. There is no indication in the record of any communication with plaintiff regarding the specific period from January 15 to February 15, the period during which the events giving rise to this action took place.

**3.** *A Quaker Action Group* involves protracted litigation challenging the validity of a Department of Interior regulation, 36 C.F.R. § 50.19, which requires the issuance of a permit for any gatherings in Lafayette Park or on the White House sidewalk. The departmental regulation further provides that no permit will be issued as to the White House sidewalk to a group of more than 100 persons, and no permit issued as to Lafayette Park to a group of more than 500 persons.

At the time of the events giving rise to this action, the Department of Interior was enjoined from enforcing this regulation; however, groups wishing to demonstrate were required to give notice of their intention fifteen (15) days in advance of any planned gathering. The purpose of the notice requirement was to permit the government to enjoin the demonstration through a judicial order, on the basis of a showing that the particular circumstances would present a threat to the life or safety of the President.

August 6, 1956 (70 Stat. 1049) as amended by the Act of January 30, 1968 (82 Stat. 4). D.C.Code § 1–1201 *et seq.* This Act authorizes the District of Columbia City Council to make all reasonable regulations necessary to secure the preservation of public order and protection of life, health, and property, and further authorizes the Secretary of Interior to grant the use of Federal lands to the Inaugural Committee for the purposes of the Inaugural Ceremonies.

The District of Columbia City Council, in promulgating regulations pursuant to the Inaugural Ceremonies Act, provided for the temporary closing of streets and reservations in connection with the Inaugural activities. Moreover, the regulations prohibited persons from passing through any rope or barricade placed by lawful authority or from intruding with any type of an obstruction into any area designated and properly marked by lawful authority contiguous to the Inaugural parade or ceremony. District of Columbia, Special Regulations For The Preservation of Public Order And The Protection of Life And Property In Connection With The 1973 Presidential Inaugural Ceremonies, Regulation No. 72–33, December 29, 1972, Sections 4–6.

On January 9, 1973, Metropolitan Police Chief Wilson, pursuant to the authority conferred upon him by the District of Columbia City Council Regulation No. 72–33, issued Special Order 73–1, which set forth arrangements and details for the Inaugural Ceremonies on Saturday, January 20, 1973. That Order, at page 21, provided:

9. PEDESTRIAN TRAFFIC, VICINITY OF THE WHITE HOUSE

No one will be permitted to enter Pennsylvania Avenue between Madison and Jackson Places or the area between Jackson Place and 17th Street, except those having tickets for the stands located thereon and newspapermen having passes entitling them to space set aside therein for newspapermen.

Contemporaneously, the United States Park Police issued analogous instructions to members of the Park Police, *i. e.,* that Lafayette Park would be completely snowfenced prior to 9 a. m. on Saturday, January 20, 1973, and would be closed to all persons except those holding tickets for the Inaugural stand, authorized news media representatives, and other persons having official duties within the area. Special Event Order No. 2 (Series 1973), United States Park Police Arrangements for the 1973 Inaugural Parade, at pages 1–2.

Named as defendants in this action are certain Federal and District of Columbia officials, as well as certain "John Does," alleged to be United States Park Police officers. Relevant to this motion are the Federal defendants: Grant Wright, Chief (since retired), Alfred Beye, Deputy Chief, (since retired), and Jerry Wells, Inspector (now Chief), all of the United States Park Police; "John Does," law enforcement officers, United States Park Police; and Arthur Lamb, Chief, Division of Special Events, National Capital Parks, National Park Service, Department of Interior. These defendants are presently before the Court, seeking dismissal, or in the alternative, summary judgment, essentially on the ground that they enjoy either an absolute or a qualified immunity from prosecution in this action. It is also suggested that the "John Doe" defendants should be dismissed for the reason that Federal courts should not entertain suits involving fictitious parties.

## I. MOTION TO DISMISS

### A. OFFICIAL IMMUNITY

The doctrine of official immunity raises many complex questions of both law and fact concerning such matters as scope of authority, nature of official duties, subjective good faith and objective reasonableness. Assertions of official immunity and the issues inherent therein may not, therefore, be resolved

on the basis of the allegations in the complaint. *Fidtler v. Rundle*, 497 F.2d 794, 801–802 (3rd Cir. 1974); *Safeguard Mutual Ins. Co. v. Miller*, 472 F.2d 732, 734 (3rd Cir. 1973); *Lasher v. Shafer*, 460 F.2d 343 (3rd Cir. 1972); *Perzanowski v. Salvio*, 369 F.Supp. 223, 231 (D.Conn.1974). As matters outside the pleadings have been submitted in both support and opposition to this motion, it must be treated as one for summary judgment. Rule 12(b), Fed.R.Civ.P.

### B. "JOHN DOE" OFFICERS

The federal defendants suggest that this action should be dismissed as to the "John Doe" defendants pursuant to Rule 12(h)(3), Fed.R.Civ.P., for the reasons that (1) Federal courts should not entertain John Doe or fictitious party suits, and (2) even if the allegations of the complaint with respect to the "John Does" are true, plaintiff has failed to state a claim upon which relief can be granted as a matter of law.

The government is correct in noting that the federal statutes and rules neither authorize nor expressly prohibit the use of fictitious parties. Furthermore, there is authority, confined principally to the Ninth Circuit, that fictitious defendants should be eliminated by motion. *Craig v. United States*, 413 F.2d 854, 856 (9th Cir. 1969), *cert. denied*, 396 U.S. 987, 90 S.Ct. 483, 24 L.Ed.2d 451 (1969); *Wiltsie v. California Department of Corrections*, 406 F.2d 515, 518 (9th Cir. 1968); *Tolefree v. Ritz*, 382 F.2d 566, 567 (9th Cir. 1967); *Sigurdson v. Del Guercia*, 241 F.2d 480, 482 (9th Cir. 1955), *cert. denied*, 348 U.S. 916, 75 S.Ct. 298, 99 L.Ed. 747 (1955), *reh'g denied*, 348 U.S. 956, 75 S.Ct. 437, 99 L.Ed. 747 (1955); *see also Hopkins v. Hall*, 372 F.Supp. 182, 183 (E.D.Okl.1974).

Eventually the "John Doe" defendants must be dismissed from the action. However, at this time, before plaintiff has had an opportunity to engage in discovery which could disclose the exact identity of the officers whom plaintiff presently is able to partially identify (*see* Affidavit of Plaintiff, Edward Saffron, at page 3, para. 9), the Court discerns no purpose in dismissal of the "John Doe" defendants. Accordingly, defendants' motion, to the extent that it suggests dismissal of the "John Doe" defendants, is denied without prejudice to its renewal at a later date.

With respect to the assertion that plaintiff has failed to state a claim against the Park Police officers, this issue necessarily may not be resolved until proper joinder has been accomplished.

## II. OFFICIAL IMMUNITY

### A. PURPOSE AND POLICY

The doctrine of official immunity arises in actions for damages[4] against public officials. It may be employed as a bar to an action and, if so, it is an absolute privilege; on the other hand, it may permit the proof of facts which, if present, constitute an affirmative defense and, if it is of this latter nature, it is characterized as a qualified privilege. *Smith v. Losee*, 485 F.2d 334, 340 (10th Cir. 1973).

Immunity "is not a badge or emolument of exalted office, but an expression of a policy designed to aid in the effective functioning of government." *Barr v. Mateo*, 360 U.S. 564, 572–573, 79 S.Ct. 1335, 1340, 3 L.Ed.2d 1434, 1442 (1959). It is designed to protect and promote the public interest in having officials "free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties—suits which would consume time and energies which

---

4. Official immunity is not assertable in the face of an action limited to injunctive, declaratory or mandamus relief. *National Treasury Employees Union v. Nixon*, 160 U.S.App.D.C. 321, 492 F.2d 587, 609 (1974); *Safeguard Mutual Ins. Co. v. Miller*, 472 F.2d 732, 734–735 (3rd Cir. 1973); *Robinson v. Pottinger*, 376 F.Supp. 615 (M.D.Ala.1974).

would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous and effective administration of policies of government." *Id.* at 571, 79 S.Ct. at 1339, 3 L.Ed.2d at 1441; accord, *Doe v. McMillan*, 412 U.S. 306, 319, 93 S.Ct. 2018, 2028, 36 L.Ed.2d 912, 924 (1973); *David v. Cohen*, 132 U.S.App. D.C. 333, 337, 407 F.2d 1268, 1271 (1969); *see also, Scheuer v. Rhodes*, 416 U.S. 232, 238–243, 94 S.Ct. 1683, 1687, 40 L.Ed.2d 90, 97 (1974); *Carter v. Carlson*, 144 U.S. App.D.C. 388, 392, 447 F.2d 358, 362 (1971), *rev'd on other grounds*, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973); *Norton v. McShane*, 332 F.2d 855 (5th Cir. 1964), *cert. denied*, 380 U.S. 981, 85 S.Ct. 1345, 14 L.Ed.2d 274 (1965); *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949) (per L. Hand, J.), *cert. denied*, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950); *Tritsis v. Backer*, 355 F.Supp. 225, 227 (N.D.Ill.1973).

▆▆▆ The immunity doctrine strives not only to promote the governmental interest but seeks also to reconcile it with the interest of the "individual citizen against pecuniary damage caused by oppressive or malicious action on the part of officials of the Federal Government." *Barr v. Mateo, supra*, 360 U.S. at 565, 79 S.Ct. at 1336, 3 L.Ed.2d at 1437. Because a balancing judgment must be made,[5] the law of immunity to civil damage suits has in large part been of judicial making with the exception of Article I, § 6 of the Constitution which provides an absolute privilege to members of both Houses of Congress in respect to any speech, debate, vote, report, or action done in session. *See Kilbourn v. Thompson*, 103 U.S. 168, 26 L.Ed. 377 (1880). The balance has been struck in favor of absolute immunity for the judiciary,[6] prosecutors[7] and public defenders[8] whose duties are tied to the judicial function, executive officials in varying degrees,[9] and legislators.[10]

## B. ABSOLUTE IMMUNITY

Until recently, the standard criteria against which claims of official immunity were judged were found in the leading Supreme Court case of *Barr v. Mateo, supra*, and the Second Circuit's exploration of the subject in *Bivens v. Six Unknown Federal Narcotics Agents, on*

5. *See C. M. Clark Ins. Agency, Inc. v. Maxwell*, 156 U.S.App.D.C. 240, 244, 479 F.2d 1223, 1227 (1973); *Dale v. Hahn*, 440 F.2d 633, 637 (2d Cir. 1971).

6. *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Bradley v. Fischer*, 80 U.S. (8 Otto) 335, 20 L.Ed. 646 (1871); *but see Gregory v. Thompson*, 500 F.2d 59, 43 U.S. L.W. 2054 (9th Cir. 1974) (doctrine of judicial immunity does not immunize justice of peace from liability for damages caused by use of physical force to personally evict allegedly disruptive person from courtroom).

7. Prosecutors have been held to enjoy absolute immunity in connection with duties intertwined with the judicial process. *See, e. g., United States ex rel. Moore v. Koelzer, supra; Bethea v. Reid, supra; Norton v. McShane, supra.* However, immunity is not available when the claim is directed to a nonjudicial function, *e. g.,* directing police investigative activity. *See, Robichaud v. Ronan*, 351 F.2d 533 (9th Cir. 1965); *Lewis v. Brautigam*, 227 F.2d 124 (5th Cir. 1955).

8. *See, e. g., John v. Hurt*, 489 F.2d 786 (7th Cir. 1973).

9. *See, Barr v. Mateo, supra; Spalding v. Vilas*, 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780 (1896); *Kendell v. Stokes*, 44 U.S. (3 How.) 87, 11 L.Ed. 506 (1845); in the United States Court of Appeals for the District of Columbia, *see, e. g., C. M. Clark Ins. Agency, Inc. v. Maxwell, supra; Carter v. Carlson, supra; David v. Cohen, supra; Laughlin v. Rosenman*, 82 U.S.App. D.C. 164, 163 F.2d 838 (1947); *Cooper v. O'Connor*, 69 U.S.App.D.C. 100, 99 F.2d 135 (1938); *but see, Scheuer v. Rhodes, supra; Apton v. Wilson, supra.* The *Scheuer* and *Apton* cases are discussed in detail *infra.*

10. *See, e. g., Doe v. McMillan, supra; Dombrowski v. Eastland*, 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967); *Tenny v. Brandove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951); *cf. Gravel v. United States*, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972); *United States v. Brewster*, 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972); *Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969).

*remand,* 456 F.2d 1339 (2d Cir. 1972). These cases set forth the following test: (1) is there a showing that the defendant was acting within the outer perimeter of his line of duty; and if so, (2) was he performing the type of "discretionary" function that entitles him to immunity from civil suit. *See Byrd v. Warden,* D.C.N.Y., 376 F.Supp. 37, 39–40 (1974); *Gardels v. Murphy, supra,* 377 F.Supp. at 1393–1394. If a defendant satisfied both of these requirements, he was entitled to absolute immunity. For those defendants who were deemed to have been performing "nondiscretionary" ("ministerial") functions, immunity was denied; however, an affirmative defense of good faith and a reasonable belief in the lawfulness of the action taken was available to these defendants. *Bivens v. Six Unknown Federal Narcotics Agents, supra,* 456 F.2d at 1347–1348.

Absolute immunity must be considered in light of the Supreme Court's recent opinion in *Scheuer v. Rhodes, supra,* particularly as the principles enunciated in that opinion have been applied to federal officials by this Circuit's opinion in *Apton v. Wilson, supra.* As is discussed below, it now appears beyond peradventure that the bar of absolute immunity no longer shields federal officials from civil damage actions. Instead, reliance must now be placed on the defense afforded by the doctrine of qualified immunity.

## C. QUALIFIED IMMUNITY UNDER THE *SCHEUER–APTON* TEST

In *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), plaintiffs as personal representatives of the estates of students killed on the campus of Kent State University, filed actions to recover damages under 42 U.S.C. § 1983 from various state officials including the Governor of Ohio, the Adjutant General and his assistant, various named and unnamed officers and enlisted members of the Ohio National Guard and the President of Kent State University. The District Court dismissed the complaints on the ground that the defendants were being sued in their official capacities and that the actions were therefore in reality against the State of Ohio and not maintainable under the Eleventh Amendment. The Third Circuit affirmed the district court and held, alternatively, that the common-law doctrine of executive immunity barred the actions. 471 F.2d 430 (6th Cir. 1972). On certiorari, the Supreme Court reversed and remanded.

First, the Court concluded that the Eleventh Amendment did not bar the claims as stated in plaintiffs' complaints. Important to the inquiry here, however, was the Court's second holding: The immunity of officers of the executive branch of a state government for their acts is not absolute but qualified and of a varying degree, depending upon the scope of discretion and responsibilities of the particular office and all of the circumstances as they reasonably appeared at the time of the action upon · which liability is sought to be predicated.

In reaching its second conclusion, the Court noted the defense of "good faith and probable cause" available to local police officers in § 1983 actions. *Id.,* 416 U.S. at 244–245, 94 S.Ct. at 1691, 40 L.Ed.2d at 102, citing *Pierson v. Ray, supra.* It recognized that "[i]n the case of higher officers of the executive branch, however, the inquiry is far more complex since the range of decisions and choices—whether the formulation of policy, of legislation, of budgets, or of day-to-day decisions—is virtually infinite." 416 U.S. at 246, 94 S.Ct. at 1691, 40 L.Ed.2d at 102. The officials must "often act swiftly and firmly at the risk that action deferred will be futile or constitute virtual abdication of office." *Id.* Moreover, they "are entitled to rely on traditional sources for the factual information on which they decide and act." *Id.* Taking all of these considerations into account, the Court concluded:

. . . in varying scope, a qualified immunity is available to officers of the executive branch of Government, the

variation dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all circumstances, coupled with good faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct.

*Id.* at 247–248, 94 S.Ct. at 1692, 40 L.Ed.2d at 103.

In remanding the case, the Court cited several issues properly before the District Court:

. . . whether the Governor and his subordinate officers were acting within the scope of their duties under the Constitution and laws of Ohio; whether they acted within the range of discretion permitted the holders of such office under Ohio law and whether they acted in good faith both in proclaiming an emergency and as to the actions taken to cope with the emergency so declared. Similarly, the complaints place directly in issue whether the lesser officers and enlisted personnel of the Guard acted in good faith obedience to the orders of their superiors.

*Id.* at 250, 94 S.Ct. at 1693, 40 L.Ed.2d at 104.

Two circuits having an opportunity to interpret the *Scheuer* decision have reached opposite conclusions as to its import and meaning. In *Fidtler v. Rundle, supra,* 497 F.2d at 800, a case involving immunity available to executive officers in a § 1983 action, a panel of the Third Circuit recently stated: "Although the language of the Supreme Court in *Scheuer* may be read to cast some doubt on the viability [of] the ministerial-discretionary distinction, the Court seems to

have adopted this general approach [absolute immunity] to immunity in section 1983 suits." The Court remanded the case to the district court for an initial determination of whether the officials (superintendent and past superintendent of a state correctional facility) were absolutely immune under the test of *Barr v. Mateo, supra.*

Our Court of Appeals has reached a different conclusion with respect to the meaning of *Scheuer* in general and its application to federal officials in particular. *Apton v. Wilson,* 165 U.S.App.D.C. 22, 506 F.2d 83 (1974). *Apton* involved an action for damages for alleged violations of Fourth and Fifth Amendment rights brought by numerous individuals who were allegedly arrested during the "Mayday Demonstrations," against the then Attorney General, Deputy Attorney General, Assistant Attorney General, unidentified local police officers, the Chief of the Metropolitan Police and the District of Columbia. The District Court granted summary judgment in favor of the Justice Department defendants on the ground that they were immune from suit over acts taken in their capacity as executive officials. The Court of Appeals reversed and remanded.[11]

The Court framed the issue before it: "do high officials of the Justice Department enjoy absolute immunity from liability for directing or participating in law enforcement activity that deprives innocent citizens of Fourth and Fifth Amendment rights?" *Id.* 165 U.S.App. D.C. at 29, 506 F.2d at 90. It then noted:

The undesirability of chilling legitimate official conduct by imposing liability has been repeatedly reaffirmed, but the principle has become increasingly difficult to apply as courts have perceived both that a wide variety of officials must make decisions when an unambiguously 'correct' choice is not

---

11. As to the District of Columbia defendants, the District Court certified the lawsuit against them to the Superior Court. In a portion of its opinion, inapposite to the discussion here, the Court of Appeals also reversed this determination and remanded.

entirely clear in advance, and that the breadth of an official's discretion does not detract from his capacity to inflict injury.

*Id.* With respect to the immunity available to executive officials, the Court intimated that the cases of *Spalding v. Vilas, supra,* and *Barr v. Mateo, supra,* should be narrowly applied to the particular injuries alleged there, loss of contract and injury to reputation respectively, and concluded that "[w]hile it is possible to draw upon these opinions for an immunity that protects officials under different circumstances . . . , the soundness of any such extension of an absolute immunity must be reappraised in the light of *Scheuer v. Rhodes, supra,* . . . ." *Id.* at 30, 506 F.2d at 91. Construing *Scheuer,* the Court of Appeals found:

> The [Supreme] Court recognized the need for public officials faced with threatened civil disorder to respond swiftly and firmly. * * * But the Court held that the need for 'decisions and action to enforce the laws for the protection of the public' could be accommodated with plaintiffs' interest in redressing violations of their constitutional rights by affording the official a qualified immunity, shielding action taken in good faith belief as to its constitutionality, a belief justified by the circumstances reasonably known to the official at the time he acts. Although the *Scheuer* opinion couples good faith belief with 'reasonable grounds' for the belief, hence the official's assertion of good faith is not conclusive, it simultaneously cautions that courts will not unfairly use hindsight in assessing official actions challenged in litigation. An officer is 'entitled to rely on traditional sources' for the information on which he forms a belief as to the lawfulness of his act. 416 U.S. at 246, 94 S.Ct. at 1691, 40 L.Ed.2d at 102. The official is protected if he entertains a reasonable belief that his actions are lawful, notwithstanding a subsequent judicial deter-

mination that his actions have infringed constitutional rights.

*Id.* 165 U.S.App.D.C. at 30, 506 F.2d at 91. Although noting that the *Scheuer* decision was not dispositive of the case at bar, the Court of Appeals held "that a qualified immunity, having the same general character as that contemplated by the Supreme Court in *Scheuer,* is available to the Justice Department defendants in the present action." *Id.* at 31, 506 F.2d at 92.

Factors deemed relevant to a consideration of good faith and reasonableness included the scope of discretion and responsibilities of the office, the extent to which an official is called upon to "act under circumstances where judgments are tentative and an unambiguously optimal course of action can be ascertained only in retrospect," and the recognition that a higher officer "may be entitled to consult fewer sources and expend less effort inquiring into the circumstances of a localized problem." *Id.* at 32, 506 F.2d at 93. For application of these standards, the case was remanded for further factual development "concerning such matters as what the defendants knew about the nature of the demonstrations and the potential for disruption, what general arrangements were made between the defendants and those in direct command of the law enforcement personnel on the streets, and what the defendants knew about the actual conduct of the peace-keeping forces deployed during the demonstrations." *Id.* at 33, 506 F.2d at 94.

Thus, under this new standard of qualified immunity, the federal defendants are protected if they, in good faith, entertained a reasonable belief that their actions were lawful, notwithstanding a subsequent judicial determination that their actions infringed constitutional rights. *Id.* at 30, 506 F.2d at 91. These defendants argue that they reasonably and in good faith acted in the belief that their actions were lawful under authority of the Inaugural legislation and regu-

lations and did not, therefore, contravene the procedures of the *Quaker Action* injunction. Such a belief appears reasonable; however, there is no foundation in the record at this time to support a finding that this belief was indeed held in good faith.

As to the reasonableness of such a belief, plaintiff argues that the *Quaker Action* orders clearly contemplated sole utilization of the 15-day notice provision and precluded the utilization of other, more vaguely worded laws to prevent demonstrations at the White House. He further states that an injunction may not be evaded by a parsing of its language and an avoidance of its intended objective. These assertions misconstrue the limited nature of the regulations involved herein. First, the Inaugural regulations were the product of specific, independent legislative authority. Second, while *Quaker Action* is concerned with the ongoing, day to day regulation of demonstrative activity in the White House area, the Inaugural legislation limited the authority of the regulations allegedly relied upon by the officers to a 10-day period occurring but once every four years. Likewise, *Quaker Action* and the regulations at issue there deal with general conditions normally existing in the White House area; the Inaugural regulations were concerned with conditions so extraordinary that they were the subject of special legislation. Finally, while *Quaker Action* demonstrates a concern for the everyday protection of the life and safety of the President, the Inaugural legislation and regulations promulgated pursuant thereto demonstrated a broader concern for the "preservation of public order and protection of life, health, and property" [D.C. Code § 1–1202(a)] during the exceptional Inaugural period.

▬ Plaintiff also argues that any reliance on the Inaugural regulations was unwarranted because the regulations imposed vague and overly broad standards to the exercise of First Amendment rights. However, the Court's inquiry at this point is directed not to the constitutionality of the regulations, but only to the reasonableness of the federal defendants' reliance upon them. An officer should not be held to act at his peril when he attempts to enforce a law or regulation which, when later held up to judicial scrutiny, may be found unconstitutional. *Cf. Bivens v. Six Unknown Federal Narcotics Agents, supra,* 456 F.2d at 1348.

▬ Plaintiff finally argues that reliance on the Inaugural regulations was unfounded because the regulations were not published in one or more of the daily newspapers published in the District of Columbia as required by D.C. Code § 1–1208. However, the affidavit submitted in support of this assertion admits an inability to examine five daily issues of area newspapers during the relevant time period and, therefore, is insufficient to overcome the presumptive validity of the regulations. Affidavit of Linda J. Farrell at para. 2. Even more important is the fact that publication was not a responsibility of the federal defendants and reliance by them on the *prima facie* valid regulations would, therefore, be both justified and reasonable.

▬ As was the case in *Apton v. Wilson, supra,* 165 U.S.App.D.C. at 34, 506 F.2d at 94, these federal defendants, "consistent with their assertion of an absolute immunity, focused their [factual] presentation on showing that [they] were acting in an official capacity." Thus, while their affidavits generally allege good faith in all actions taken by them, there is nothing in the record at this point to support a finding of the specific, good faith belief necessary for the invocation of qualified immunity. Moreover, "where the controversy turns on officials' knowledge and good faith belief—matters on which much of the relevant evidence will be possessed exclusively by officials themselves—the challenging party must be given the opportunity to show genuine dispute as to facts that are material under the appropriate legal

principle." Id. 165 U.S.App.D.C. at 34, 506 F.2d at 95. Accordingly, although reliance upon the Inaugural legislation and regulations would appear reasonable, summary judgment at this juncture is unjustified.

### ORDER

Upon consideration of the motion of defendants Wright, Beye, Wells and Lamb to dismiss or, in the alternative, for summary judgment, the memoranda of points and authorities submitted in support and opposition thereto, as well as the affidavits filed by the parties, and after oral argument in open court on the motion, and in accordance with the foregoing memorandum, it is this 2nd day of January, 1975,

ORDERED THAT Defendants' Motion to Dismiss Or, In The Alternative, For Summary Judgment be and the same hereby is denied; and

FURTHER ORDERED that defendants' motion, to the extent that it suggests dismissal of the "John Doe" defendants, is denied without prejudice to its renewal at a later date.