Edward SAFFRON, Plaintiff,

v.

Jerry V. WILSON et al., Defendants.

Civ. A. No. 74–0079.

United States District Court,
District of Columbia.

Aug. 14, 1979.

Ralph J. Temple, Warren Kaplan, Paul Zevnik, Washington, D. C., for plaintiff.

Royce Lamberth, R. Craig Lawrence, Asst. U. S. Attys., John J. Buckley, Jr., Terrence O'Donnell, Leonard Bren, Asst. Corp. Counsel, Washington, D. C., Myles Ambrose, James G. Ryan, Leslie Nicholson, Washington, D. C., for defendants.

## MEMORANDUM

OBERDORFER, District Judge.

## INTRODUCTION

This case arose from the removal from sidewalks adjacent to the White House and the subsequent arrest in Lafayette Park on Inaugural Day 1973 of Edward Saffron, who was there as a pedestrian peacefully carrying a sign bearing a political-religious message similar to one he had carried in front of the White House on an almost daily basis over the previous four years. Plaintiff seeks damages against the District of Columbia, a number of officers and officials of the United States Park Service and the District of Columbia Metropolitan Police, and agents and officers of the United States Secret Service. He also prays for injunctive and declaratory relief against the official defendants—heads of the Park Police, Metropolitan Police and Secret Service because they allegedly violated his constitutional rights under the First, Fourth and Fifth Amendments. Plaintiff claims defendants violated those rights by interrupting his sign-carrying on Inaugural Day, by arresting him and by failing to establish a constitutionally-valid plan to regulate expressive conduct on Inaugural Day 1973. Plaintiff claims defendants threaten to violate those rights on future Inaugural Days because they have failed to adopt any such plan for future Inaugural Days.

All defendants have moved to dismiss and for summary judgment on all issues; plaintiff filed dispositive motions against only a few defendants on several issues. To facilitate the progress of this litigation, the Court entered a number of orders resolving most of the pending dispositive motions prior to the issuance of this memorandum. In its orders of January 5 and 9, 1979, the Court granted summary judgment (1) for the eight individual Secret Service officers Rundle, Burke, Town, Jones, Shanahan, Evans, McLeod and Lau, based upon their statute of limitations defense; (2) for individual Park Police defendants Wright, Dickenson, Beye, Hill, Lindsey, Herbert, Brady, Niedringhaus and Burdick (para. 2) and Wells (para. 4), based upon immunity; and (3) for the District of Columbia defendants Wilson, Mann and McKnight, also based upon immunity. As to one party, the Court vacated its earlier order and (4) granted the motion to dismiss on behalf of decedent Arthur Lamb, named as a Park Police defendant. The Court reserved the issue of the liability of the District of Columbia, having requested further briefing in its order of January 5, 1979.

After further consideration of the statements of material facts and the replies thereto, and other statements and the arguments and admissions of counsel on the record in the context of pre-trial conference on January 9, 1979, conducted pursuant to F.R.Civ.P. 16, the Court concluded that there were no material issues of fact to be

tried and requested the parties to file statements of proposed facts to which they agreed and facts to which they did not agree; order of February 2, 1979. After consideration of the briefs on that issue, as well as plaintiff's motion for reconsideration of the dismissal as to Mann, McKnight and Wilson, and the able oral arguments of counsel for the several parties, the Court concluded that no material issues of fact existed which barred entry of summary judgment for the District of Columbia on the issue of liability in damages. In its order of April 27, 1979, the Court summarized its actions subsequent to its January orders and resolved remaining outstanding motions. It (5) extended its findings of immunity, granting summary judgment for defendant Rowley, and (6) granted summary judgment for the District of Columbia on the issue of its liability in damages. Finally the Court (7) entered summary judgment for plaintiff on the issue of his entitlement to equitable or declaratory relief against the District of Columbia and against official defendants Knight, Wells and Jefferson in their capacities as heads of the Secret Service, the Park Police and the Metropolitan Police respectively.

This memorandum builds upon the joint findings submitted by the parties and sets forth the conclusions of law which underlay the Court's earlier rulings. Leaving for separate treatment matters relating solely to the defenses of immunity and the statute of limitations, Part I of the memorandum embodies general findings of fact, setting the background for the memorandum by identifying the parties (Part A), explaining the so-called *Quaker Action* notice system (Part B), and the Presidential Inaugural Ceremonies Act and regulations (Part C), setting forth plaintiff's compliance with the *Quaker Action* procedures (Part D), defendants' planning for the 1973 Inaugural (Part E), the facts relating to plaintiff's removal and arrest (Part F), and planning with respect to the 1977 and future Inaugurals (Part G).

Part II sets out the conclusions of law relating to jurisdiction and mootness (Part A) and, in the remaining sections, conclu-

sions relating to the official defendants' liability and the remedy to which plaintiff is entitled. Because of the differing roles of the parties, liability is best analyzed by recognizing four somewhat overlapping bases for liability: (i) plaintiff's removal from the White House sidewalk; (ii) the events in Lafayette Park, including plaintiff's arrest; (iii) failure to promulgate a plan for the regulation of expressive conduct on Inaugural Day prior to Inaugural Day 1973 and (iv) failure subsequent to that day. Part B analyzes defendants' liability for plaintiff's removal from the White House sidewalk and for the failure to promulgate a plan at the time and subsequently; Part C deals with liability for plaintiff's arrest in Lafayette Park; Part D deals with the question of the District of Columbia's liability in damages for plaintiff's removal and arrest and for its role in the failure to promulgate a plan. Part E considers the propriety of the injunctive relief sought; the specific relief to which the Court concludes plaintiff is entitled is set out in Part F.

Part III embodies findings of fact and conclusions of law as to the immunity defense of the Park Police and District of Columbia individual defendants. Finally, Part IV sets forth findings and conclusions as to the statute of limitations defense of the individual Secret Service defendants. The Court reserves for separate treatment issues relating to the course and conduct of this litigation and the motions for sanctions, having concluded that such issues are not material to the Court's judgment as to defendants' substantive liability and the remedy to which plaintiff is entitled.

I. FINDINGS OF FACTS WITH RESPECT TO DEFENDANTS' VIOLATION OF PLAINTIFF'S CONSTITUTIONAL RIGHTS

A. *The Parties*

1. Plaintiff Edward Saffron is a resident of the District of Columbia (Saffron dep. at 3).

2. The District of Columbia is a municipal corporation and is the constituted government of the District of Columbia.

3. Defendant Jerry L. Wells is the Chief of the United States Park Police; he is sued in both individual and official capacities.

4. Defendant H. Stuart Knight has been Director of the United States Secret Service since November 1973 and is sued in his official capacity only.

5. Defendant Burtell Jefferson is the Chief of the Metropolitan Police Department and is sued in his official capacity only.

6. On Inaugural Day 1973, · defendant Jerry Wilson was Chief of the Metropolitan Police Department; he is sued individually.

7. On Inaugural Day 1973, defendant Russel E. Dickenson was Director of the National Parks Program.

8. On Inaugural Day 1973, defendant Grant Wright was Chief of the United States Park Police.

9. On Inaugural Day 1973, defendant Alfred Beye was Deputy Chief of the Park Service.

10. Defendant Arthur Lamb, now deceased, was, on Inaugural Day 1973, Chief and Acting Chief of the Division of Special Events of the National Park Service.

11. On Inaugural Day 1973, defendant James J. Rowley was Director of the United States Secret Service; he is sued individually.

12. Defendants Hill, Lindsey, Herbert, Brady, Niedringhaus and Burdick were on Inaugural Day 1973 officers of the Park Police. Defendants Hill, Lindsey and Herbert had supervisory authority over the other officers.

13. Defendant Stephen Mann was a Metropolitan Police Officer on Inaugural Day 1973; defendant Jerry McKnight was Officer Mann's immediate supervisor and was present when Mann arrested plaintiff. (Mann dep. at 11–12; McKnight dep. at 12; Ans. of def. Wilson to Interrogs., ¶ 1, June 16, 1976; Ans. of def. District of Columbia to Interrogs., ¶ 1, June 14, 1976).

14. The Metropolitan Police Department is responsible for enforcing the laws and ordinances of the District of Columbia in the city and has secondary responsibility in the areas of national parkland.

15. The United States Park Police is a sub-agency of the Department of the Interior and is responsible for enforcing Department of Interior regulations governing demonstrations on national parkland, including the White House sidewalk and Lafayette Park. (36 C.F.R. §§ 50.1, 50.19 (1978)).

16. As pertinent to this case, the United States Secret Service has no particular geographical area of jurisdiction. The Service has responsibility for the protection of the President and other designated domestic and foreign officials. (18 U.S.C. § 3056 (1976)).

B. *The Quaker Action Notice System*

17. In 1966, the Secretary of the Interior promulgated regulations requiring "an official permit" for "public gatherings", including parades, ceremonies, and demonstrations on certain parklands within the jurisdiction of National Capital Parks, National Park Service ("National Capital Parks"). The parklands subject to this permit requirement included the sidewalk on the south side of Pennsylvania Avenue, N.W., between East and West Executive Avenues ("the White House sidewalk") and Lafayette Park, a park on Pennsylvania Avenue across from the White House, and contiguous sidewalks ("Lafayette Park"). The head of National Capital Parks was delegated the authority and responsibility to act on applications for permits to demonstrate. Demonstrating without a permit subjected demonstrators to arrest by the Park Police, and imprisonment; 31 Fed. Reg. 6263 (April 23, 1966), *amended*, 32 Fed.Reg. 13582 (September 28, 1967), *codified at* 36 C.F.R. §§ 50.5, 50.19 (1968).

18. Beginning in August 1967, the regulations were enforced by National Capital Parks, and demonstrators lacking an official permit were arrested by the Park Po-

lice; *A Quaker Action Group v. Hickel*, 137 U.S.App.D.C. 176, 179, 421 F.2d 1111, 1114 (D.C.Cir.1969) (*"Quaker Action I"*).

19. (a) In March 1969, a lawsuit was filed in the United States District Court for the District of Columbia challenging the constitutionality of the regulations and asserting that the permit system had been administered in an arbitrary and capricious way to harass would-be demonstrators and to deny permit applications without adequate justification. The lawsuit has become known as the *Quaker Action* case after the name of one of the plaintiffs. The defendants in *Quaker Action* included the Secretary of the Interior, the Director of the National Park Service, and the head of National Capital Parks; *Quaker Action I, supra*, 137 U.S.App.D.C. 179–180, 421 F.2d at 1114–15.

(b) In April 1969, the District Court granted the plaintiffs' request in *Quaker Action* for a preliminary injunction against enforcement of the permit regulations pending a determination of the merits of the case. Under this injunction, the head of National Capital Parks was prevented from requiring an official permit for demonstrations; *Quaker Action I, supra*, 137 U.S.App. D.C. at 178, 184, 421 F.2d at 1113, 1119; *A Quaker Action Group v. Morton*, 516 F.2d 717, 721 (D.C.Cir.1975) (*"Quaker Action IV"*).

(c) On appeal, the United States Court of Appeals for the District of Columbia Circuit affirmed the grant of the preliminary injunction against the enforcement of the permit system. The Court of Appeals modified the injunction to require that anyone wishing to demonstrate in the area of the White House must—instead of applying for a permit to demonstrate—provide notice of the planned demonstration to the head of National Capital Parks at least fifteen days before the event; *id.*

20. Under this procedure imposed by the Court, if a federal agency wished to prevent a planned demonstration for which a fifteen-day notice has been filed, the agency was required to apply to the District Court for a court order to stop the demonstration. National Capital Parks did not have the authority under the injunction to deny, on its own, permission to demonstrate pursuant to a fifteen-day notice. If no court order were obtained, persons demonstrating pursuant to a fifteen-day notice were treated, in effect, as demonstrators with a federally-authorized permit to demonstrate; *Quaker Action I, supra*, 137 U.S.App.D.C. at 184, 421 F.2d at 1119; *A Quaker Action Group v. Hickel*, 139 U.S.App.D.C. 1, 2 n.1, 429 F.2d 185, 186 n.1 (D.C.Cir.1970) (*"Quaker Action II"*); *A Quaker Action Group v. Morton*, 148 U.S.App.D.C. 346, 355–356, 460 F.2d 854, 863–4 (D.C.Cir.1971) (*"Quaker Action III"*); Wells dep. at 2, 28.

21. The fifteen-day notice system established by the Court of Appeals was in effect for a time in 1969 and continuously from April 1970 to September 1973. A form of fifteen-day notice was approved by the Court of Appeals in October 1970 and was in use continuously from that date until September 1973; *A Quaker Action Group v. Morton*, 362 F.Supp. 1161, 1167 (D.D.C.1973) (remand from *Quaker Action III*); 35 Fed. Reg. 17552 (November 14, 1970).

22. The fifteen-day notice form prescribed by the Court of Appeals in the *Quaker Action* case was addressed to the General Superintendent (later called "Director") of National Capital Parks of the National Park Service. The fifteen-day notices were filed at the office of the Division of Special Events, a department of National Capital Parks; 35 Fed.Reg. 17552 (November 14, 1970); Lamb dep. at 7, 10, 44–50.

23. Under the system to handle fifteen-day notices it was not necessary for a person or group to receive any confirmation from National Capital Parks regarding a fifteen-day notice before demonstrating pursuant to the notice. People who filed fifteen-day notices and received no communication were entitled to rely on the notice as giving them authority to demonstrate in conformity with the notice; Dickenson dep. at 57.

C. *The Presidential Inaugural Ceremonies Act and Regulations Thereunder*

24. (a) The Presidential Inaugural Ceremonies Act, as amended, confers upon the

Secretary of the Interior the authority to grant national parkland for the use of the Inaugural Committee, if requested, and confers upon the District of Columbia the authority to adopt ordinances and regulations applicable to each Inauguration; Presidential Inaugural Ceremonies Act, P.L. 84–986, 70 Stat. 1049 (1956), *amended by* Act of Jan. 30, 1968, P.L. 90–251, 82 Stat. 4 (1968), D.C.Code § 1–1201 *et seq.*

(b) In conjunction with the authority conferred by the Presidential Inaugural Ceremonies Act, the Director of National Capital Region, National Park Service notified the Chairman of the Inaugural Committee that the Lafayette Park area was committed to the exclusive use of the Inaugural Committee from January 15–25, 1973; Lamb dep. at 77–78, Lamb dep. exh. 15; Dickenson dep. at 53.

(c) Pursuant to the authority of the Presidential Inaugural Ceremonies Act, the District of Columbia City Council adopted Regulation No. 72–33 authorizing the Chief of Police to close streets and areas for the 1973 Inaugural; Regulation 72–33, Park Service Defendants' Motion for Summary Judgment.

(d) Pursuant to Regulation No. 72–33, the Metropolitan Police Department adopted Special Order No. 73–1, which, *inter alia*, established police lines around the Lafayette Park area and prohibited entry except to persons having valid press passes and credentials from the Inaugural Committee; Special Event Order No. 73–1 §§ 4, 5; Park Service Defendants' Motion for Summary Judgment.

(e) The United States Park Police, pursuant to Special Event Order No. 2 closed the Lafayette Park and White House areas to all persons except those with a ticket or press pass for the area; Special Event Order No. 2, 1973 series, Park Service Defendants' Motion for Summary Judgment.

25. The Presidential Inaugural Ceremonies Act, District of Columbia City Council Regulation 72–33, Metropolitan Police Department Special Order 73–1 and Park Police Special Event Order No. 2 did not address demonstrators or demonstrations or

the effect of the *Quaker Action* order. There was no plan or procedure for the application or dissemination of any Inaugural or other regulations or rules which were potentially applicable to peaceful demonstrators or demonstrations in the vicinity of the White House and the Lafayette Park area on Inauguration Day, 1973, either within any of the federal agencies or the Metropolitan Police or jointly.

26. The arresting officer, and certain supervisors and individual officers of the Park Police and the Secret Service who were assigned to the reviewing stand area on January 20, 1973, were unaware of the existence and terms of any Inaugural or other regulations or rules which were potentially applicable to peaceful demonstrators or demonstrations in the vicinity of the White House and the Lafayette Park area and of their duties or those of their agency or of other coordinate agencies to comply with any such Inaugural or other regulations or rules.

27. No officer or official undertook, on behalf of the Inaugural Committee or in light of the joint planning and coordination of security functions in the reviewing stand area, to determine whether or not to approach the *Quaker Action* Court for a countervailing order as to any demonstration noticed for that area on Inaugural Day, 1973.

28. Comparing the Presidential Inauguration Ceremonies Act and the provisions of *Quaker Action* at an earlier point in this litigation, Judge William B. Jones found as follows:

First, the Inaugural regulations were the product of specific, independent legislative authority. Second, while *Quaker Action* is concerned with the ongoing, day to day regulation of demonstrative activity in the White House area, the Inaugural legislation limited the authority of the regulations allegedly relied upon by the officers to a 10-day period occurring but once every four years. Likewise, *Quaker Action* and the regulations at issue there deal with general conditions normally ex-

isting in the White House area; the Inaugural regulations were concerned with conditions so extraordinary that they were the subject of special legislation. Finally, while *Quaker Action* demonstrates a concern for the everyday protection of the life and safety of the President, the Inaugural legislation and regulations promulgated pursuant thereto demonstrated a broader concern for the "preservation of public order and protection of life, health and property" (D.C. Code § 1–1202(a)) during the exceptional Inaugural period.

*Saffron v. Wilson,* 70 F.R.D. 51, 61 (D.D.C. 1975).

29. None of the opinions in *Quaker Action* makes mention of Inaugural Day or the special circumstances of that day.

D. *Plaintiff's Compliance with Quaker Action Procedures*

30. Plaintiff Edward Saffron has regularly picketed alone in the vicinity of the White House since 1969. It has been his customary practice to wear or carry signs relating to a personal grievance he has against the United States Government; Saffron Affidavit (filed May 24, 1974), ¶ 2–3.

31. While the fifteen-day notice system was in effect, plaintiff regularly filed fifteen-day notices for his picketing. At the request of National Capital Parks beginning in June 1971, plaintiff filed his fifteen-day notices once each month to cover a thirty-day period. Thus, for example, a notice filed on the first day of the month covered the thirty-day period from the sixteenth day of that month through the fifteenth day of the following month; Dickenson dep. at 24–25 and exh. 3; Lamb Affidavit (April 26, 1974), ¶ 3.

32. On November 30, 1972, plaintiff filed with the Division of Special Events a fifteen-day notice that, according to the practice established for plaintiff's notices, covered the period December 15, 1972, through January 15, 1973; Lamb dep. exh. 5.

33. The Division of Special Events distributed copies of plaintiff's notice to, among others, the Park Police, the Metropolitan Police, the Secret Service and the F.B.I.; *id.*

34. On January 2, 1973, plaintiff filed with the Division of Special Events a fifteen-day notice that, according to the practice established for plaintiff's notices, covered the period January 16, 1973, through February 15, 1973; Lamb dep. exh. 10; Lamb Affidavit (April 26, 1974), ¶ 3.

35. No motion was filed in *Quaker Action* to obtain a court order, and no such order was entered, to prevent plaintiff's demonstration pursuant to his fifteen-day notice of November 30, 1972.

36. No motion was filed in *Quaker Action* to obtain a court order, and no such order was entered, to prevent plaintiff's demonstration pursuant to his fifteen-day notice of January 2, 1973, for the period which included Inaugural Day 1973.

E. *Planning for the 1973 Inaugural*

37. The Inaugural parade in 1973 was an event organized, financed and staged by a private organization called the 1973 Inaugural Committee; Lamb dep. at 75–76.

38. The 1973 Inaugural Committee requested Lafayette Park for its exclusive use for the Inaugural parade; Lamb dep. at 77–78.

39. (a) The person in charge of supervising, planning and preparation for the Secret Service for the 1973 Inaugural, given the title of Inaugural Coordinator, was Robert R. Burke, who is at present Deputy Assistant Director of the Secret Service and who in 1973 was an inspector in the Internal Investigation Unit of the Secret Service; Burke dep. at 1–2.

(b) Park Service planning for Inaugurals begins in the December before with the creation of a pre-Inaugural Committee of the Park Service, which reviews material from past Inaugurals. Specific planning can begin shortly after the election and appointment of an Inaugural Committee by the President-elect; *see* Lamb dep. at 69–78.

40. The Secret Service necessarily plays the lead role, in conjunction with the Park Police and the Metropolitan Police, in coordinating plans and procedures for dealing with demonstrators and demonstrations during Inaugurals in the vicinity of the President. Coordination of functions and activities is required for law enforcement activities in the Lafayette Park and White House areas during such events; Burke dep., *passim.*

41. Any occurrence or person that could potentially cause a disturbance, diversion, disruption, or any other circumstance that would pose or increase security problems related to the Secret Service's protective functions are of particular concern to the Secret Service. Because demonstrators are particularly noticeable and hence create greater potential for causing a disturbance, diversion, disruption or any other circumstance that would pose or increase security problems related to the Secret Service's protective functions, their actions in the vicinity of a Secret Service protective function are particularly scrutinized by Secret Service agents; Burke dep. at 51–52, 54, 63–64.

42. The Inaugural Secret Service advance team for the 1973 Inaugural, in charge of making and coordinating arrangements in the Lafayette Park and White House areas, was headed by Secret Service Inspector William R. Holmes and his deputies John M. Wiley and Clint Howard; Burke dep. at 3; Holmes dep. at 10–13; Wiley dep. at 6–7; Howard dep. at 6–9.

43. Secret Service Agents Holmes, Wiley and Howard met regularly and on a largely informal basis with supervisory officials and other officers of the Park Police and the Metropolitan Police prior to January 20, 1973, in order to review, plan and coordinate security arrangements in the vicinity of the reviewing area in front of the White House, and including all of Lafayette Park, and to review anticipated problems for the security and other management of these areas, including anticipated demonstrators and demonstrations; Holmes dep. at 14; Wiley dep. at 19–22; Howard dep. at 20–25.

44. Written memoranda were apparently not prepared in connection with these meetings, either for instructional purposes or to assign and coordinate functions or to record the substance of these meetings; Holmes dep. at 14–20.

45. Two or three days before the 1973 Inaugural, Agents Holmes, Wiley, Howard and Burke met with other Secret Service officers to discuss the nature of the briefing which would be held for the instruction of Secret Service officers as to their responsibilities on January 20, 1973; Holmes dep. at 20–22.

46. (a) A briefing for all Secret Service officers who would be in the Lafayette Park area on January 20, 1973 was held in the New Executive Office Building, ending at approximately 9:30 a. m. on January 20, 1973. At this briefing there was no instruction given or discussion held relating to demonstrators or demonstrations, to the impact of the *Quaker Action* order and non-enjoined *Quaker Action* notices in light of the Inaugural, or to constitutional rights, including the First Amendment right of demonstrators; Holmes dep. at 23–24; Wiley dep. at 13.

(b) A briefing was held for all Park Police officers who would be assigned to the Lafayette Park area. All officers were informed that only persons with tickets or press passes could be admitted to the area. At this briefing there was no instruction given or discussion held relating to demonstrators or demonstrations, to the impact of the *Quaker Action* order and non-enjoined *Quaker Action* notices in light of the Inaugural, or to constitutional rights, including the First Amendment right of demonstrators; Hill dep. at 7, 13–14, 15; Lindsey dep. at 15–17.

(c) A meeting of the Metropolitan Police officers for a description and distribution of duty assignments in the Lafayette Park area on January 20, 1973, was held on the morning of that day. During this meeting, officers were told that entrance to that area would be permitted at designated points to ticket and press pass holders. At

this meeting there was no instruction given or discussion held relating to demonstrators or demonstrations, to the impact of the *Quaker Action* order and non-enjoined *Quaker Action* notices in light of the Inaugural, or to constitutional rights, including the First Amendment rights of demonstrators.

47. During the time security operations continued in effect in the reviewing stand area on January 20, 1973, officers of the Metropolitan Police, the Park Police and the Secret Service could at all times communicate with their respective agencies through radio contacts and with members of other agencies by radio through a central command post.

48. The Secret Service, Park Police and Metropolitan Police, regularly consulted with each other and made joint decisions concerning, respectively, access to the reviewing stand area, and the authority of persons to be located in areas contiguous to the review stand area; Holmes dep. at 31–38; Wiley dep. at 18–22.

49. There was no written plan or procedure for the application of the *Quaker Action* order or any other plan for regulation of expressive conduct on Inauguration Day, 1973, either within any of the federal agencies or the Metropolitan Police or jointly.

F. *Plaintiff's Removal and Arrest*

50. About 9:20 a. m., on January 20, 1973, plaintiff arrived at the south side of Pennsylvania Avenue in front of the Executive Office Building between 17th Street and West Executive Avenue, N. W. Plaintiff put on his sandwich-board sign and began to picket slowly and peacefully by himself; Saffron dep. at 32–33.

51. Shortly thereafter, plaintiff moved his picketing east to the intersection of West Executive Avenue and the south side of Pennsylvania Avenue. Stands or bleachers blocked West Executive Avenue; on either side of the intersection were the bleachers in front of the Executive Office Building (to the west) and the stands built into the street in front of the White House (to the east); Saffron dep. at 32–33; Exhib-

it G2, Motion of Defendants Wright, *et al.* to Dismiss (filed April 26, 1974).

52. After plaintiff arrived at West Executive Avenue on the south side of Pennsylvania Avenue, Park Police officers James C. Lindsey and William P. Brady arrived at the scene. Brady saw and read plaintiff's fifteen-day notice, and the notice was shown to Lindsey. Brady advised plaintiff that he would have to leave the area, and plaintiff responded that he had a "permit" to demonstrate. Without consulting anyone, Lindsey decided that plaintiff had to be removed from the area, and Brady escorted plaintiff across Pennsylvania Avenue to the southwest corner of Lafayette Park. At the time of his removal, plaintiff was not placed under arrest by the Park Police for violating any law; Burdick dep. at 15–16, 17; Brady dep. at 15–18; Lindsey dep. at 23–24, 26.

(a) Lindsey understood that his assignment on January 20, 1973, included assisting the Secret Service in screening persons near the White House. Lindsey was in plainclothes; Lindsey dep. at 9, 12, 21; Lindsey dep. exh. 1.

(b) Lindsey was familiar with the fifteen-day notice system, had seen plaintiff demonstrating in the area on prior occasions, and had on occasion been involved in checking plaintiff's fifteen-day notice; Lindsey dep. at 16, 29–30.

(c) Brady understood that his assignment on January 20, 1973, included assisting the Secret Service in the vicinity of West Executive Avenue on the south side of Pennsylvania Avenue. Brady was in plainclothes; Brady dep. at 8, 9; Lindsey dep. exh. 1.

(d) Brady was familiar with the fifteen-day notice system, had seen plaintiff demonstrating in the area on prior occasions, and had on occasion been involved in checking plaintiff's fifteen-day notice; Brady dep. at 16–17, 21–23, 77.

53. After plaintiff had for a time continued picketing peacefully with his sandwich-board sign at the southwest corner of Lafayette Park, a discussion ensued at that location regarding plaintiff's presence and his

fifteen-day notice. According to Park Police officers the discussion included still-unidentified agents of the Secret ·Service, plaintiff, and officers of the Park Police, including Parker T. Hill, Paul J. Herbert, Brady, and Donald L. Niedringhaus. Plaintiff asserted that he had a permit to demonstrate in the area. No Secret Service agent who has been contacted, interviewed or deposed in conjunction with this litigation has stated that he recalls such a discussion although it is disputed that all who might recall such a discussion have been so contacted, interviewed or deposed. No Park Police officer could identify a particular Secret Service agent as having participated in the discussions; Burdick dep. at 18; Brady dep. at 29–37; Herbert dep. at 16–19, 20, 43; Hill dep. at 21, 23, 24–25; Niedringhaus dep. at 19–22, 26–27, 37.

54. Park Police officers reported that during this discussion, one of the Secret Service agents had expressed concern about plaintiff's presence as a demonstrator. The agent told Hill that plaintiff was making the Secret Service agents nervous and that they wanted plaintiff removed from the area. Hill, without consulting anyone, then told the Secret Service agent or agents "We'll get him out of here," and directed two or more Park Police officers to take plaintiff north to H Street. No Secret Service agent who has been contacted, interviewed or deposed in conjunction with this litigation has stated that he recalls such a discussion although it is disputed that all who might recall such a discussion have been so contacted, interviewed or deposed. No Park Police officer could identify a particular Secret Service agent as having participated in the discussions; Findings of Fact 78, infra.

(a) Hill understood that his assignment on January 20, 1973, included providing support to the Secret Service in Lafayette Park; Hill dep. at ·5–7.

(b) Hill was familiar with the fifteen-day notice system and had seen plaintiff demonstrating in the area of the White House and Lafayette Park on prior occasions; Hill dep. at 17–19, 27–28.

55. At about 11:00 a. m., Niedringhaus, Herbert, and Brady escorted plaintiff from the southwest corner of Lafayette Park north to the intersection of Jackson Place and H. Street. Niedringhaus and Brady or Herbert grabbed plaintiff by the arms. At the time of this removal, plaintiff was not placed under formal arrest by the Park Police for violating any law; Brady dep. at 37–38, 76; Niedringhaus dep. at 21–32; Herbert dep. at 22–23.

(a) Herbert understood that his assignment on January 20, 1973, included providing assistance to Secret Service agents in the west half of Lafayette Park; Lindsey dep. exh. 1; Herbert dep. at 8, 12.

(b) Herbert had seen plaintiff demonstrating in the area of the White House on prior occasions and had been involved in checking his fifteen-day notice; 'Herbert dep. at 17–18.

(c) Niedringhaus understood that his assignment on January 20, 1973, included assisting Herbert in the west half of Lafayette Park; Niedringhaus dep. at 8, 10.

(d) Niedringhaus had seen plaintiff picketing in the White House area on prior occasions; Niedringhaus dep. at 6.

56. Niedringhaus, Herbert and Brady escorted plaintiff across the police line north of Lafayette Park and told plaintiff and Metropolitan Police officers that plaintiff was not allowed to return south to Lafayette Park. Mann heard the federal officers tell plaintiff that plaintiff was not allowed to return; Mann dep. at 22–24; Brady dep. at 44, 47–48; Herbert dep. at 27–29; Niedringhaus dep. at 27–29.

57. Plaintiff headed in another direction, away from Mann's presence for some time and, when he returned, plaintiff told Mann that plaintiff had a right to return south to the area from which he had been removed. When plaintiff attempted to cross the police line in order to reenter that area, at about 11:45 a. m., Mann arrested him on a charge of failure-to-move-on; Mann dep. 25, 29–30; Mann dep. exh. 2; Monroe dep. at 12–13.

58. The deposition of officer Mann reveals that he arrested Saffron because Saffron had crossed the police line into a blocked off area:

Q: Okay. Now, did any particular event precipitate your arrest of Mr. Saffron: Anything he said or did?

A: What he did. He came back across the street into the area which was blocked off;

Mann dep. at 35.

59. Mann called a police wagon to transport plaintiff to a nearby precinct station. When the wagon arrived, a picture was taken of Mann standing next to the plaintiff. Plaintiff was frisked and handcuffed by the officers in the wagon crew. Plaintiff was transported in the police wagon to the precinct station and, after about an hour of additional detention, posted collateral and was freed. The failure-to-move-on charge was later dropped by the District of Columbia Corporation Counsel's office; Mann dep. at 39–40, 42–43; Saffron dep. at 45–48, 54.

60. Defendant District of Columbia admits that the charge of failure-to-move-on did not properly apply to plaintiff.

61. At no time during his presence on the south side of Pennsylvania Avenue at West Executive Avenue, on the southwest corner of Lafayette Park, or at H. Street where he was arrested did plaintiff engage in a violent act or threaten anyone with violence; Brady dep. at 27, 50–51; Niedringhaus dep. at 36; Lindsey dep. at 30–31; Hill dep. at 28; Mann dep. at 27.

G. *Planning With Respect to First Amendment Rights of Demonstrators at Inaugural Days Subsequent to 1973*

62. Neither the Metropolitan Police, the Park Police nor the Secret Service promulgated, applied or disseminated, either individually or jointly, a plan or procedure for dealing with, and protecting, the First Amendment rights of lawful demonstrators and demonstrations in the vicinity of the White House and Lafayette Park area on Inauguration Day, 1977.

63. Neither the Metropolitan Police, the Park Police nor the Secret Service has yet promulgated, applied or disseminated, either individually or jointly, a plan or procedure for dealing with, and protecting, the First Amendment rights of lawful demonstrators and demonstrations in the vicinity of the White House and Lafayette Park area on Inauguration Day, 1981.

64. No modification in plan or procedure has been made as a result of this litigation and none is planned as to the Secret Service; Knight dep. at 39–40.

Plaintiff continues to appear carrying signs in front of the White House and alleges that he feels inhibited as to Inaugural Day picketing; Second Amended Complaint ¶¶ 49, 50.

65. Plaintiff did not attempt to appear or carry any sign in front of the White House on Inaugural Day, 1977.

## II. CONCLUSIONS OF LAW

A. *Jurisdiction and Mootness*

1. The Court has jurisdiction in this matter under 28 U.S.C. § 1331 (1976).

2. This case is not moot. Plaintiff has evidenced a pattern of demonstrating on the White House sidewalk over an eight year period. The fact that he has occasionally been sick and did not demonstrate on Inaugural Day 1977 does not disrupt that pattern. Plaintiff alleges that he is discouraged from the exercise of his First Amendment rights both during his daily picketing and on future Inaugural days; Second Amended Complaint ¶¶ 49, 50. Plaintiff has appeared in this Court in this case on numerous occasions; for example, portions of his deposition of November 16, 1978, were taken in the presence of the Court. The Court is convinced that plaintiff would continue to picket in the future and on future Inaugural days if he could do so without interference; the Court is also convinced that, given the current lack of regulations governing such conduct, plaintiff faces an uncertain reception on future Inaugural days. Thus plaintiff's claim presents an ongoing case or controversy.

Compare *O'Shea v. Littleton*, 414 U.S. 488, 495–98, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

B. *Official Defendants' Liability for Plaintiff's Removal From White House Sidewalk and Failure to Promulgate Valid Plan or Regulations*

■ 3. Plaintiff had a constitutional right to engage in expressive conduct on the White House sidewalk on Inaugural Day 1973. That right may only be restricted by defendants according to non-discriminatory, articulated standards, in sufficient time for judicial review of a denial or restriction of his right, in accordance with the principles set out by our Court of Appeals in *Quaker Action IV, supra;* see Conclusions of Law 20, *infra.*

■ 4. Official defendants Wells, Knight, Jefferson and the District of Columbia violated that right when they detained plaintiff and removed him from the White House sidewalk after failing prior to January 20, 1973, to promulgate regulations appropriate to Inaugural Day pursuant to the principles ultimately announced in *Quaker Action IV, supra.*

5. Had defendants promulgated and pursued a constitutional plan for the regulation of expressive conduct on Inaugural Day, plaintiff's right to be present on the White House sidewalk would have been determined in advance and, if necessary, judicially reviewed. There is no evidence nor allegation here that plaintiff's removal was occasioned by any emergency or any factor which would have justified summary removal, even if there had been a valid plan. Under the undisputed facts, therefore, the failure of defendants to promulgate and enforce a constitutionally-valid plan was the proximate cause of the violation of plaintiff's constitutional rights on Inaugural Day 1973; *Shifrin v. Wilson*, 412 F.Supp. 1282, 1303 (D.D.C.1976).

6. Defendants' failure since 1973 to promulgate Inaugural Day regulations constituted an ongoing violation of plaintiff's constitutional rights and constitutes a continuing threat by defendants to impose the same restraints upon plaintiff's expressive conduct on future Inaugural Days.

■ 7. Although defendant Secret Service takes a lead in Inaugural Day planning, all three official defendants jointly share the responsibility for that planning; See Findings of Fact 24, 39, 40, 42, 43, 46, 47, 48, *supra.* Therefore, the official defendants representing the Secret Service, the Metropolitan Police and the Park Police are legally responsible for their past and ongoing failure to accord their Inaugural Day planning with the Constitution; *See also* Conclusions of Law 14–16, *infra.* It is irrelevant to this conclusion, and the Court need not find, that Secret Service agents personally participated in ordering or requesting Saffron's removal from the White House sidewalk; *See* Findings of Fact 53, 54, *supra.*

8. The principles governing plaintiff's right to engage in expressive conduct near the White House on Inauguration Day, the government's right under certain circumstances to restrict that conduct and the constitutionally-permissible methods of so restricting it (including provision for judicial review of restrictions) are set out authoritatively in *Quaker Action IV, supra.* That case arose from an attempt by five organizations to hold demonstrations on the White House sidewalk and in Lafayette Park in 1969. Most of the groups had unsuccessfully applied to the Park Service for permits, pursuant to a requirement, neglected until 1967, that individuals obtain permits prior to use of National Park areas within the District for public gatherings; 36 C.F.R. 50.19 (1973); in reactivating the requirement in 1967, a numerical restriction on groups which would be granted permits was imposed; *supra* at 721.

The final chapter of the lengthy litigation, which generated four Court of Appeals decisions, represented a definitive statement of the principles to guide the regulation of expressive conduct in the White House vicinity, and applied those principles in reviewing the District Court's evaluation of the existing regulations which had occurred in the context of a full trial. Earli-

er, the Court had overturned the entry of summary judgment for the government, concluding that the balancing of First Amendment and other rights involved "required the judgment of the court" and should not be based merely on a finding of reasonableness and substantial evidence in the administrative record; the question of the "safety of the President" and whether

> officials involved ha[d] transformed the concern into an excessive preoccupation with security that is achieved at the unnecessary expense of First Amendment freedoms . . . is too difficult, too delicate, too dependent on careful assessment and weighing of constitutional rights, to rest conclusively on the untested declaration of an executive official.

*Quaker Action IV, supra,* at 723.

The Court of Appeals identified the duties of the government in regulating expressive conduct and evaluated some of the interests to be considered in that regulation, an evaluation directly applicable to this case. The "proper course," it concluded, is to balance First Amendment rights against other legitimate interests and to structure a scheme that does not "risk abuse of First Amendment rights through a broad censorship power or other improper application of theoretically acceptable restraints." *Id.* at 725 (footnote omitted). It quoted a summary of guidelines laid down by the Supreme Court:

> [R]estrictions on expression are valid if (1) the "[regulation] furthers an important or substantial government interest," (2) the "governmental interest is unrelated to the suppression of free expression," and (3) the incidental restriction on alleged First Amendment rights is no greater than is essential to the furtherance of that interest.

*Id.* at 725–26, *quoting Jeannette Rankin Brigade v. Chief of Capitol Police,* 342 F.Supp. 575, 584–85 (D.C.), *aff'd mem.,* 409 U.S. 972, 93 S.Ct. 311, 34 L.Ed.2d 236 (1972).

Relevant here, the *Quaker Action IV* Court approved as significant several governmental interests advanced in justifying regulation, among them the "security and safety of the Executive Residence, its occu-

pants and contents" and "inconvenience to vehicular and pedestrial traffic"; *id.* at 726. It also evaluated the First Amendment rights involved, rejecting definitively the view that expressive conduct is of secondary importance on park lands and concluding that the White House area is a "unique situs" for demonstration activity. It rejected the government's contention that plaintiffs were not harmed by the restrictions because they could hold their demonstrations on the Ellipse instead of near the White House, saying:

> there are unique First Amendment values in use of the White House sidewalk; and citizens seeking redress of grievances are not unreasonable if they propose to come to the front of the House rather than be shunted to the back door. Of course there may come a time when the crowd is so huge that it is reasonable to insist that all facilities [*e. g.* Lafayette Park] be used.

*Id.* at 733.

The Court also noted the corollary of its conclusion that the White House area constituted a "unique situs": "there is a need for a governmental mechanism for allocating the scarce time and space resources . . . among competing applicants;" *id.* at 727. Thus, it concluded, a permit system is far preferable to a notice system; *id.*

█ In sum, *Quacker Action* makes it clear that plaintiff's expressive conduct cannot be arbitrarily restricted or excluded from the White House vicinity and supports the Court's conclusions 3 and 4 as to past and ongoing violations of plaintiff's rights by official defendants. There are undoubtedly special circumstances relating to the vicinity of the White House on Inauguration Day that are inapplicable all other days. But the official defendants have a constitutional duty to confront these circumstances and deal with them in regulations developed in light of the principles announced in *Quaker Action IV.*

C. *Liability for Plaintiff's Arrest*

(i) *Arrest Pursuant to Incorrect Statute*

█ 9. Plaintiff was arrested while attempting to cross a police line; *see* Findings

of Fact 57, *supra.* This action made him validly subject to arrest pursuant to D. C. Police Regulations, Art. 6, Sec. 5. Since the correct promulgation of that regulation is not in dispute, the Court need not reach the issue of the validity of the promulgation of Sections 5 and 6 of the Special Regulations for the Inaugural period, which sections the Court concludes would otherwise also have subjected plaintiff to arrest. While not deciding the issue, the Court would observe that the notice afforded by the valid Police Regulations should serve as notice of Sections 5 and 6 to the extent they cover the same conduct.

10. Although Saffron was charged under the wrong statute, his arrest by Officer Mann was valid and thus neither the District of Columbia nor Mann may be liable for damages for that arrest. The Court finds entirely unpersuasive the authority which suggests that an arrest made on one charge cannot later be justified by reference to another proper grounds for arrest. Those cases present little reasoning and are not helpful here; they generally involve attempts at post hoc rationalization where, for example, an individual had been improperly arrested for disorderly conduct and the prosecutor later argued that the individual might have been properly arrested for an unrelated and improbable traffic violation, *e. g. Moran v. City of Beckley,* 67 F.2d 161, 162–63 (4th Cir. 1933); *Donovan v. Guy,* 347 Mich. 457, 80 N.W.2d 190 (1956).

More persuasive was the action of this circuit in *Washington Mobilization Committee v. Cullinane,* 184 U.S.App.D.C. 215, 231, 566 F.2d 107, 123 (D.C.Cir.1977), in overturning the District Court's conclusion that

The most egregious failings during the arrest and booking process, perhaps because there could be no reasonable excuses, were the refusal to advise arrestees of the specific charges being made against them . . . ..

The Court concluded that the lower court's conclusion cannot be supported. In *Feeley v. District of Columbia,* [128 U.S.App. D.C. 258, 387 F.2d 216] upon which the court relied, we held that an information upon which a defendant is tried must specify which of several potentially applicable statutes is the basis of the prosecution. The case does not hold that a policeman making an arrest must immediately advise the prisoner of the specific section of the statute or regulation he is charged with violating. A policeman on the scene cannot be expected to assay the evidence with the technical precision of a prosecutor drawing an information.

In *United States v. Hobby,* 275 A.2d 235, 237 (D.C.App.1971), the police and government prosecutor mistakenly charged an individual who allegedly possessed a shotgun with violation of a statute applicable only to concealed weapons. The Court concluded that

the state of mind of an officer who makes an arrest is not the relevant test of whether such action is valid. . . . As the United States Court of Appeals for this circuit put it in *Bell v. United States,* 102 U.S.App.D.C. 383, 387, 254 F.2d 82, 86 (1958) " . . . this description given by the officer does not go to the question of probable cause. The question is not what name the officer attached to this action; it is whether, in the situation in which he found himself, he had a reasonable ground to believe a felony had been committed . . . "

*See also Bond v. United States,* 310 A.2d 221 (D.C.App.1973).

In sum, the Court concludes that failure to charge under the proper statute provides no basis for liability in this case.

11. Officer Mann acted in good faith; that is, he had reasonable grounds to believe that a crime was being committed and that his arrest of plaintiff was undertaken for the purpose of securing the administration of the law; *Dellums v. Powell,* 184 U.S.App.D.C. 275, 283, 566 F.2d 167, 175 (D.C.Cir.1977) ("*Dellums I*"); Mann dep. at 19, 24–25, 31, 35.

(ii) *Liability for Arrest Because of Antecedent Events*

 12. Under some circumstances an individual may violate a law and defend against prosecution by pointing to that law's unconstitutionality; *Shuttlesworth v. Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *compare Walker v. City of Birmingham*, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967) (unconstitutional injunction must be obeyed, only remedy being judicial relief through an appeal of the injunction). Thus, if plaintiff had been arrested and prosecuted for his presence on the White House sidewalk, a constitutional defense might be available to him against that prosecution.

The fact that he might have disobeyed a regulation or police order forbidding his presence at the earlier time, and then attacked the constitutionality of that regulation or order in court, however, does not entitle him to violate *other* valid regulations or orders. After plaintiff was removed to Lafayette Park, he headed in another direction, and then somewhat later returned to Lafayette Park where he attempted to cross the police line; *see* Findings of Fact 57. He did not receive, in effect, immunity to return to the scene of the constitutional violation.

Although "but for" causation may exist between plaintiff's illegal removal from the White House sidewalk and his later arrest, plaintiff's own intervening illegal conduct in attempting to cross the police line, after being warned not to do so, destroys any proximate causation between the earlier events and the arrest. Assuming *arguendo* that the arrest was proximately caused by the earlier unconstitutional action, plaintiff might possess a good defense against a charge of crossing a police line. But the fact that he might not be convicted does not automatically present him with grounds for false arrest. Mann's good faith belief in arresting Saffron, under the standard of *Dellums I, supra*, 184 U.S.App.D.C. at 283, 566 F.2d at 175, Conclusion 11, *supra*, renders the arrest privileged, even assuming that plaintiff could not be convicted be-

cause of the earlier events which brought him to Lafayette Park.

13. The Court concludes that defendant was entitled to summary judgment under either theory of liability.

D. *Liability of District of Columbia for Plaintiff's Removal From White House Sidewalk and Failure to Promulgate Valid Plan: The Damages Issue*

14. With respect to claims by individuals against state and local governments, the traditional structure of remedies, in which equitable relief would not be available unless a legal remedy is either unavailable or inefficacious, may, on occasion, be reversed. Equitable relief is often the preferred remedy. This reversal is apparent from the line of cases beginning with *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), which, disregarding the fiction that the remedy runs against an individual and not the sovereign, permitted broad equitable relief against states but was hostile to remedies requiring expenditure of money, particularly remedies in the nature of damages or relating to past state conduct. *See Edelman v. Jordan*, 415 U.S. 651, 669, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

The inversion of the normal structure of remedies has also been recognized in the cases which established that, where equitable relief against federal officials would be unavailing, citizens are entitled to sue such officials for damages resulting from invasion of constitutional rights. In *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 397, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), a case involving a warrantless entry into a home and arrest, the Court recognized a federal cause of action under the Fourth Amendment for which damages were recoverable for injuries resulting from federal agents' violation of that amendment. In passages later adopted by the Court, Justice Harlan wrote in concurrence:

. . . it is apparent that some form of damages is the only possible remedy for someone in Bivens' alleged position. It will be a rare case indeed in which an individual in Bivens' position will be able

to obviate the harm by securing injunctive relief from any court. However desirable a direct remedy against the Government might be as a substitute for individual official liability, the sovereign still remains immune to suit. Finally, assuming Bivens' innocence of the crime charged, the "exclusionary rule" is simply irrelevant. For people in Bivens' shoes, it is damages or nothing.

*Id.* at 409–10, 91 S.Ct. at 2012.

He also noted some of the practical considerations in deciding whether a damages remedy should be implied:

. . . the experience of judges in dealing with private trespass and false imprisonment claims supports the conclusion that courts of law are capable of making the types of judgment concerning causation and magnitude of injury necessary to accord meaningful compensation for invasion of Fourth Amendment rights.

*Id.* at 409, 91 S.Ct. at 2011.

The same, of course, may not be true with respect to other types of constitutionally protected interests, and therefore the appropriateness of money damages may well vary with the nature of the personal interest asserted.

*Id.* at 409, n.9, 91 S.Ct. at 2011.

In *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), the Court recognized a right to recover damages for violation of the Due Process Clause of the Fifth Amendment. It endorsed Justice Harlan's concurring language in *Bivens* and summarized the factors for determining the propriety of a damages remedy:

*Bivens, supra,* holds that in appropriate circumstances a federal district court may provide relief in damages for the violation of constitutional rights if there are "no special factors counselling hesitation in the absence of affirmative action by Congress." . . .

First, a damages remedy is surely appropriate in this case. "Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty." . . . relief in dam-

ages would be judicially manageable, for the case presents a focused remedial issue without difficult questions of valuation or causation. See *id.,* at 409 [91 S.Ct. 1999 at 2011] (Harlan, J., concurring in judgment). Litigation under Title VII of the Civil Rights Act of 1964 has given federal courts great experience evaluating claims for backpay due to illegal sex discrimination. See 42 U.S.C. § 2000e–5(g). Moreover, since respondent is no longer a Congressman, . . . equitable relief in the form of reinstatement would be unavailing. And there are available no other alternative forms of judicial relief. For Davis, as for Bivens, "it is damages or nothing." . . .

*Id.* at 2276–77.

The reasoning and holding of *Bivens* is pertinent to the determination whether a federal court may provide a damages remedy. The question of the appropriateness of equitable relief in the form of reinstatement is not in this case, and we consequently intimate no view on that question.

*Id.* at 2277 n. 24.

15. With respect to the events prior to Saffron's attempt to cross the police line in Lafayette Park, a useful distinction may be drawn between two wrongs involved. The Court's conclusion with respect to plaintiff's First Amendment rights makes it clear first that he was wronged when he was interrupted in his picketing and removed by Park Police from the White House sidewalk. Secondly, it is clear that the failure to have a plan to protect his rights or to restrict his conduct by appropriate procedures constitutes a wrong which has been ongoing since January 20, 1973, which at the least may chill his conduct on future Inaugural Days. This distinction is useful as it is apparent that responsibility for each tort is not identical.

16. For the purpose of this decision, the Court assumes that the holding of *Dellums v. Powell,* 184 U.S.App.D.C. 324, 328–32, 566 F.2d 216, 220–24 (D.C.Cir.1977) ("*Dellums II*") that the District may be found vicariously liable for the constitutional torts of its

employees, has been overruled *sub silentio* by *Monnell v. New York City Dept. of Social Services*, 436 U.S. 653, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), which rejected vicarious liability for actions under 42 U.S.C. § 1983 (1976).

(a) *Liability for D. C. Employees' Actions.*

■ Even if responsibility is shared with other agencies, the District may be liable if its employees had a role in the events which form the basis for liability. *Dellums II, supra*, for example, rejected the claim that Metropolitan Police Chief Wilson was not liable for his role in the false arrest and violation of First Amendment rights there:

> . . . [E]vidence would support a finding that Chief Wilson collaborated on the charge upon which arrests were to be made, and further that he advised [Capitol Police] Chief Powell against taking additional steps to ensure the effectiveness of dispersal orders at a time when there was some doubt that the orders had been heard. It is also undisputed that Chief Wilson retained personal operational control over all Metropolitan Police officers on the scene and could have withdrawn them had he thought the arrests unjustified. This was sufficient proof of Chief Wilson's independent involvement in the arrest process to make his liability one for the jury to decide.

*Id.* 184 U.S.App.D.C. at 327, 566 F.2d at 219.

As found above, however, no Metropolitan Police or D. C. officials participated in the decisions that were made or the actions that occurred in front of the White House. Although communication channels existed, and although the official defendants cooperated both in planning and on Inaugural Day itself, the Park Police involved in plaintiff's removal were under the command of Park Police officials. No District employees had sufficient direct involvement to permit liability for plaintiff's removal on this basis.

(b) *Liability for Park Police Actions: Borrowed Servant Theory*

■ To establish a causal connection between the actions of the Park Police and the District of Columbia, therefore, plaintiff would have to prove that the Park Police were "borrowed servants" of the District, that they were "doing the work of" the District. *Dellums II, supra*, 184 U.S. App.D.C. at 328, 329, 566 F.2d at 220, 221; *Denton v. Yazoo & Mississippi Valley R. Co.*, 284 U.S. 305, 308–9, 52 S.Ct. 141, 76 L.Ed. 310 (1932). *Dellums* rejected the District's claim that it was not liable for Chief Wilson's actions because, pursuant to a plan of cooperation between the Metropolitan and Capitol Police, Wilson was acting in effect as an employee of the latter. The Court held that

> there is a presumption that an actor remains in his general employment
>
> > so long as, by the service rendered another, he is performing the business entrusted to him by the general employer. *There is no inference that because the general employer has permitted a division of control, he has surrendered it.* [Citing Restatement (Second) of Agency, § 227, comment b. at 501, accord, Dornan v. United States, 460 F.2d 425, 428 (9th Cir. 1972).]

There can be no question that Chief Wilson was performing the "business entrusted to him by [his] general employer" when he undertook to keep the peace on Capitol Hill pursuant to an agreement between the Capitol and Metropolitan Police. Consequently, to avoid liability the District must show that the United States had "the power to control and direct [Chief Wilson] in the performance of [his] work" and *liability does not shift to the United States unless it has "authoritative direction and control" over Chief Wilson, which is something more than the power merely to "suggest details or the necessary cooperation."*

*Id.* 184 U.S.App.D.C. at 329, 566 F.2d at 221 (emphasis supplied).

*Dellums* rejected the claim that the District could avoid liability because its employee was working for the Capitol Hill Police, and thus speaks from the perspective of a hypothetical claim by the Park Service that the District was alone liable for the Park Police officers' conduct. But

246

the case is apposite in the analogous situation here in which the District could be liable for the Park Police officers' action if those officers had, as a result of the cooperation of official defendants, come under the "authoritative direction and control" of the District. Present here was an arrangement of cooperation and consultation, "the power merely to 'suggest details or the necessary cooperation'", *id.*, but no evidence or allegation of even a division of control that would permit the District to order the Park Police to act to remove or arrest someone or to veto their actions; *id.* 184 U.S.App.D.C. at 330, 566 F.2d at 222. Under the undisputed facts, the Court concludes that the agreement was insufficient to permit liability to be shared by the District for those officers' conduct.

### (c) *Liability for Park Police Action: Failure to Plan Theory*

*Dellums* teaches that cooperative responsibility is not sufficient for imposing liability in damages upon a party whose employees did not directly commit the tort, unless the actual tortfeasors were "borrowed employees" of that party. Nonetheless where a duty to act exists, such as a duty to disclose material facts or a duty to draw regulations in a constitutional fashion, a failure to act may be the basis for liability as well as action itself. Thus, because of its joint responsibility to plan for the Inauguration and its duty to obey the Constitution, the District is liable for the "ongoing tort" relating to the failure to have a constitutional plan and the threat posed thereby. And some type of causal connection unquestionably exists between this joint failure and Saffron's removal on January 20, 1973.

Here, however, confronting its duty "to make principled choices among traditional judicial remedies," *Bivens, supra,* 403 U.S. at 408, n. 8, 91 S.Ct. at 2011 (Harlan, J., concurring), the Court must reject a damages remedy against the District for plaintiff's removal.

First, as the foregoing analysis suggests, if not broken entirely by the requirements of "borrowed employee" liability, the causal connection between plaintiff's removal and the District is at best complex and attenuated. Its connection, via the ongoing tort, is shared with two other parties, both of whom had primary roles in theory and practice and both of whom are immune from damages. The difficulties for a jury in sorting out the complex relationships and assigning liability are apparent.

Secondly, while a "touching" occurred during plaintiff's removal and while, in an even more attenuated sense, his later (legitimate) arrest was connected causally to his improper removal, there is present here none of the physical mistreatment that was suffered by plaintiffs in *Dellums* or *Bivens* or the real economic loss suffered by the plaintiff in *Passman.* The significant harm here was and is interference with First Amendment rights. Unlike harms resulting from, *e. g.,* employment discrimination, there exist no recognized means of quantifying the harm here in dollars; *compare Passman, supra,* 99 S.Ct. at 2277. This case is thus a polar opposite from *Passman* in which the Court found that "[r]elief in damages [may] be judicially manageable, for the case presents a focused remedial issue without difficult questions of valuation or causation." *Id.* at 2277.

Thirdly, while valuation is certainly not an insurmountable barrier to a damages remedy here, *compare Dellums I, supra,* 184 U.S.App.D.C. at 302–305, 317–318, 566 F.2d at 194–97, 209–210, unlike the situations in *Passman* and *Bivens,* other forms of relief are both available and more efficacious. Equitable relief will provide the only real remedy for the past wrong, vindicating plaintiff's presence on the White House sidewalk in 1973. And it assures his future exercise of First Amendment rights, remedying the more significant ongoing tort. In some speech cases, damages might be the only way to attempt to make the victim whole, since the speech opportunity may be fleeting, never to recur. But Saffron is a perennial demonstrator at the White House. Declaratory and, if necessary, equitable relief here will assure him a constitutionally-guaranteed encore on Inaugural Day 1981 and every four years thereafter so long as he is willing and able to pursue it.

### E. *Propriety of Injunctive Relief*

■ 17. The Court has seriously considered defendants' argument that no injunctive relief is warranted here because there is no evidence of a pattern of illegal conduct and because, based solely on one incident, there is no evidence that the harm which occurred in 1973 will recur. In *Long v. District of Columbia*, 152 U.S.App.D.C. 187, 469 F.2d 927 (D.C.Cir.1972), plaintiff sought injunctive relief for himself and a class of individuals who had been the subject of a "stop and frisk." The D.C. Circuit noted that:

> . . . there have been no factual allegations which, if proven, would show the existence of a policy of making unlawful frisks. The allegation here is of a single isolated incident. Even assuming any illegality, one could not conclude from this solitary occurrence that frisks are ordinarily carried out in similar situations.
>
> Considerations of policy dictate that the courts act cautiously in granting injunctions against police action. A court should not bind the hands of the police on the mere possibility that certain conduct may be repeated. To do so would unnecessarily involve the courts in police matters and dictate action in situations in which discretion and flexibility are most important. In order for a court to grant an injunction, there should be a showing that there is a substantial risk that future violations will occur.

*Id.* 152 U.S.App.D.C. at 192, 469 F.2d at 932.

And even where a pervasive pattern of mistreatment by police officers exists, the Supreme Court has held that absent an

> . . . affirmative link between the occurrence of the various incidents of police misconduct and the adoption of any plan or policy by [city officials]—express or otherwise—showing their authorization or approval of such misconduct,

the likelihood of "real and immediate injury" would be too small to "show a present case or controversy regarding injunctive relief." *Rizzo v. Goode*, 423 U.S. 362, 371–72, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976).

The D.C. Circuit applied *Rizzo* in *Washington Mobilization Committee, supra,* overturning a District Court order requiring the preparation of a comprehensive manual specifying policies to be followed in dealing with future mass demonstrations. The case centered on twenty-five instances of the use of excessive force by individual police officers, and incidents relating to unreasonable delays in booking and other mistreatment of arrested demonstrators. The Court concluded that there was no evidence that official defendants authorized or approved such excessive force, and that "defendants cannot be charged with the aberrations of a comparative handful of individual policemen in a department consisting of 5,000 members;" *id.* 184 U.S.App.D.C. at 230, 566 F.2d at 122, particularly in light of the hundreds of demonstrations which occurred annually where there were no allegations of police misconduct. In sum, it was not reasonable to extrapolate a policy of lawlessness from the incidents involved in that case. *See also O'Shea v. Littleton, supra,* 414 U.S. at 502–3, 94 S.Ct. 669 (1974).

Those cases provide a stark contrast with the unique and limited factual situation at issue here and the very narrow relief to be awarded. They all involve the conclusion that injunctive relief affecting police conduct on a day-to-day basis could not be based upon a limited number of incidents, because a pattern of misconduct warranting broad injunctive relief was not inferrable from those incidents.

But the issue those cases raise has been resolved for this Court by *Quaker Action*, which imposed injunctive relief affecting day-to-day police conduct. Unlike those cases, *Quaker Action* involved officially-adopted regulations, so that there was no question of establishing an ongoing factual pattern of conduct which violated constitutional rights. The element of injunctive relief sought which the Court concludes is appropriate here serves to fill a gap in *Quaker Action*, a gap relating to one day every four years, or one day out of 1461. Because of the difference in time span, the reasoning of *Rizzo, Long,* or *Washington Mobilization Committee* is simply inapplica-

ble. As in *Long, supra,* only a single incident is involved; but there the illegal conduct could potentially have occurred 365 days a year, so that the failure to establish a pattern or the likelihood of repetition was apparent. The same is true of *Rizzo* and *Washington Mobilization Committee;* in the latter this Circuit held that incidents relating to 7 out of 300 demonstrations during one year were not sufficient to establish a policy of lawlessness; *id.* 184 U.S.App. D.C. at 230, 566 F.2d at 122. Unlike *Long, Rizzo* or *Washington Mobilization Committee,* here there can be no question of the unconstitutionality of official policy. *Quaker Action IV, supra,* commands that expressive conduct near the White House be regulated only according to clearly established standards. Thus the "general policy of unlawfulness," *Washington Mobilization Committee, supra* 184 U.S.App.D.C. at 231, 566 F.2d at 123, is not something which need be inferred from a series of incidents. In light of *Quaker Action's* command, it follows merely from the absence of the appropriate regulations.

In sum, the Court concludes that the conduct of defendants on Inaugural Day is the result of official policy and that the relief contemplated, directed solely against such policy (or absence of policy) is neither overly-broad nor intrusive but extremely limited in its spatial and temporal duration. Nor, in light of the precedent of *Quaker Action IV, supra,* can such injunctive relief be said to be overly intrusive in police affairs. Thus there is no barrier posed by *Rizzo, Long* or *Washington Mobilization Committee.*

18. Plaintiff also seeks injunctive relief against misuse of the failure-to-move-on statute in demonstration situations and a declaration that the statute is unconstitutional. Such relief is inappropriate in the context of this case. First, plaintiff's arrest was proper, so that any misuse of the failure-to-move-on statute is *damnum absque injuria.* Secondly, while interference with plaintiff's expressive conduct on future Inaugural Days is a live possibility, the possibility that such interference would take the form of an arrest for failure-to-move-on is

highly speculative; moreover, the remedy granted in this case makes such a possibility even more speculative. . And finally, while plaintiff argues that his arrest takes place "against a background of widespread police abuses of the disorderly conduct law, particularly the 'failure-to-move-on' law as applied to demonstrations," no evidence of this pattern of abuse is or properly should be before this Court in this case. Relief might properly be sought by a class of individuals injured by misuse of this law, with proof as to the existence of a pattern of conduct and official sanction thereof, as required by *Rizzo, Long* and *Washington Mobilization Committee.* This is not such a case.

19. Similar reasoning applies to the broad prayer for injunctive relief against Secret Service interference "with lawful demonstrators." Second Amended Complaint, Prayer 1 ¶ 6. No case or controversy has been presented to support such unlimited relief; plaintiff puts at issue in this action only the regulation of expressive conduct in the White House vicinity on Inaugural Days.

## F. *Remedy*

20. To the extent that the Inaugural Act and regulations promulgated thereunder failed to establish criteria for regulating expressive conduct in the area in front of the White House where plaintiff attempted to picket or, by silence on the subject permitted a blanket ban on his expressive effort in that area on Inaugural Day 1973, the Act and regulations were unconstitutionally enforced on that day. Since it is clear, however, that the impact of the Act is realized only through the various regulations it authorizes, that such regulations are reevaluated for each Inauguration, and that planning for the 1981 Inauguration has not yet begun, it is unnecessary to declare the Act invalid or pass judgment on the yet-to-be-formulated regulations.

Plaintiff is entitled to the entry of summary judgment on his behalf, to a declaration of the past unconstitutional application

of the regulations, and a declaration of plaintiff's rights, and of the means by which they are to be secured, thereby permitting defendants to comply with the Constitution in their planning for the 1981 and future Inaugurations. He is also entitled to access to the continuing jurisdiction of this Court in this action to permit him to seek redress from any such injury threatened or inflicted in the future, e. g.: should defendants' actions in planning for the next Inauguration fail to comply with the appropriate constitutional standards or should issues arise with respect to an application to demonstrate which he may file pursuant to the plan ultimately adopted.

Defendants can find guidance for the performance of their tasks in *Quaker Action's* evaluation of the competing interests. Here, the interest in presidential safety and crowd management near the White House on Inauguration Day is even greater than on any other day; concomitantly time in the White House vicinity on Inaugural Day is a far scarcer resource than time on other days. As to the latter factor, notice procedures need not apply to Inaugural Day; a permit or ticket system for that day could be fashioned consistently with the principles of *Quaker Action.*

 As to the former factor, the Court does not view the regulations required by *Quaker Action IV* to limit in any way the authority of responsible officials to act during the Inaugural period to carry out their duties, as articulated in the regulations, in protecting the President and managing traffic and crowds. Fulfilling those duties on Inaugural Day may well justify total exclusion of expressive conduct, at some specific times and places, so long as such exclusion is nondiscriminatory and reasonably aimed at carrying out those articulated goals, rather than imposing censorship. And although "improper application of theoretically acceptable restraints," *id.* at 725, must be guarded against, the possibility of such abuse is minimized if officers in the field have enjoyed earlier orientation and training with respect to protection of First Amendment rights and have the benefit of

general regulations governing non-emergency exercise of those rights. Under those circumstances, the quick, emergency decisions of such officers should enjoy great deference from reviewing bodies.

## III. IMMUNITY DEFENSES

### A. *Findings of Fact*

66. Immunity from liability in damages is sought by all defendant Park Police Officers, defendant Rowley and the eight Secret Service defendants and by D. C. defendants Wilson, Mann and McKnight. Earlier in this litigation, defendants Wright, Beye, Wells and Lamb moved for summary judgment based upon immunity; *Saffron v. Wilson,* 70 F.R.D. 51 (D.D.C. 1975). While Judge Jones concluded that the belief that the requirements of *Quaker Action* did not apply to Inaugural Day "appears to be reasonable" and that reliance upon the Inaugural regulations was "justified and reasonable," *see* Findings of Fact 28, *supra,* he denied summary judgment because there was

> nothing in the record at this point to support a finding of the specific, good faith belief necessary for the invocation of qualified immunity.

70 F.R.D. at 61.

The Court relied upon *Apton v. Wilson,* 165 U.S.App.D.C. 22, 506 F.2d 83 (D.C.Cir. 1974) for the proposition that "the challenging party must be given the opportunity to show genuine dispute as to facts that are material under the appropriate legal principle" as to the issue of the official defendants' knowledge and good-faith belief, *id.* 165 U.S.App.D.C. at 34, 506 F.2d at 95. In that case, noting that official defendants had not developed a record on that issue and had resisted plaintiffs' efforts at discovery, *id.* 165 U.S.App.D.C. at 33, 506 F.2d at 94, the Circuit overturned the entry of summary judgment for defendants based upon immunity.

67. Park Police defendants are alleged to have known or to be chargeable with knowledge that their actions with respect to plaintiff were in violation of the require-

ments of *Quaker Action* and the Constitution. Alternatively, the subordinate officers are alleged to have been negligent in failing to consult higher authority to ascertain the legality of their conduct; supervisory officers allegedly were negligent in supervising and training their subordinates. (Complaint, ¶¶ 43, 44).

68. In his opposition to Park Service Defendants' Motion for Summary Judgment and reply to their Opposition to Plaintiff's Motion for Summary Judgment, plaintiff states, at (23):

C. *The possibility of malice against plaintiff cannot be dismissed.*

It is not true that there is no evidence of specific malice directed at Saffron as an individual. The notion that he was hostile to Police was so common among Park Police that it had reached the Commander of the Operations Division, now Chief, Jerry Wells. . . . Furthermore, the fact that a group demonstration was permitted to proceed along the parade route reasonably gives rise to the inference that the Police regarded themselves as free to interfere with an individual whom they might regard as eccentric.

69. Plaintiff alleges that defendant Rowley and the other Secret Service defendants caused the interference with plaintiff because of their "indiscriminate antipathy to demonstrators" or by a policy of "neglecting to supervise Secret Service personnel concerning the rights of lawful demonstrators" and that such antipathy or negligent supervision evidenced either (i) "conscious acquiescence" in the interference with Saffron by the agents; (ii) reckless disregard of such interference, or (iii) negligence in preventing such interference; Second Amended Complaint, ¶ 45.

70. In his opposition to defendant Rowley's Motion for Summary Judgment, plaintiff states, at (1):

the gravamen of plaintiff's complaint is that Rowley negligently failed to supervise and instruct Secret Service agents and officials and negligently failed to coordinate his agency's functions with those of other law enforcement agencies and

that these acts and ommissions (*sic*) led to Secret Service involvement causing plaintiff's arrest and consequent injuries.

71. Plaintiff does not allege malicious intent on the part of District of Columbia defendants Wilson, McKnight or Mann. Plaintiff does allege that defendant Wilson was aware of and approved another demonstration in another location on Pennsylvania Avenue on Inaugural Day, and that Wilson had direct responsibility for demonstration activities on that day; Plaintiff's Opposition to D. C. Defendants' Motion for Summary Judgment and Dismissal (filed December 6, 1978) 14, 15; Plaintiff's Reply to Supplementary Memorandum of the District of Columbia Regarding Immunity (filed February 2, 1979) 9–10. Plaintiff's other allegations relate to defendants' failure to honor or make provision for *Quaker Action* permits on Inaugural Day.

72. No facts proffered by plaintiff would permit an inference of bad-faith conduct with respect to plaintiff on the part of any defendant.

B. *Conclusions of Law*

21. Even though individual defendants have infringed plaintiff's constitutional rights, a qualified immunity bans imposition upon them of liability in damages; *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 898 (1978); *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Saffron v. Wilson*, 70 F.R.D. 51 (D.D.C.1975).

22. Official immunity may be asserted only against claims for damages, and not against claims for injunctive, declaratory or mandatory relief. *National Treasury Employees Union v. Nixon*, 160 U.S.App.D.C. 321, 343, 492 F.2d 587, 609 (D.C.Cir.1974); *Safeguard Mutual Insurance Company v. Miller*, 472 F.2d 732, 734–35 (3rd Cir. 1973). Equitable relief was sought only against defendants Jefferson, Wells and Knight, Second Amended Complaint, Prayer at 3, 4,

5, 6, however, so that dismissal of the action against the other individual defendants was appropriate. Declaratory or injunctive relief can be granted in the surviving actions against the official defendants.

23. Our Court of Appeals recently addressed the bases for qualified immunity in *Halperin v. Kissinger,* 196 U.S.App.D.C. 285, 606 F.2d 1192 (D.C.Cir.1979). The Court noted that the Supreme Court had adopted for federal officials the "objective and subjective standards for qualified immunity" of *Wood v. Strickland* :

> [An official is] not immune * * * [A] if he knew or reasonably should have known that the action he took * * * would violate the constitutional rights of the [person] affected, or [B] if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury * * *. * * * "

*Id.* at 302, 606 F.2d at 1209 (*quoting Wood v. Strickland, supra,* 420 U.S. at 322, 95 S.Ct. 992).

The Court analyzed the Supreme Court's recommendation, made in an effort to reduce the potential for harassment, that immunity be decided on motion for summary judgment. The objective basis for immunity ("A") is most amenable to such an approach: "Courts should be able to determine at the pretrial stage whether there is a genuine issue of material fact as to the reasonableness of defendant's belief that he was acting legally." *Id.* at 302, 606 F.2d at 1209. The subjective basis ("B") is more problematic, the Court noted, because questions of intent and subjective attitude frequently cannot be resolved without direct testimony. But in view of the Supreme Court's "emphasis upon the importance of summary procedures," District Courts are charged with careful examination of any defendant's claim that plaintiff has not raised a genuine material fact as to defendant's subjective good faith; *id.* The Court of Appeals quoted a formulation of the summary judgment standard adopted by the Seventh Circuit in *Askew v. Bloemker,* 548 F.2d 673, 679 (7th Cir. 1976):

Plaintiffs are entitled to take to the jury the state-of-mind defense on which the defendants herein rely as long as plaintiffs have adduced specific facts from which a reasonable man, viewing all the evidence in the light most favorable to plaintiffs, and resolving all testimonial conflicts in the same manner, could infer that the defendants were acting * * * in bad faith * * *.

*Halperin v. Kissinger, supra,* at 302 n. 119, 606 F.2d at 1209 n. 119.

This Circuit noted in addition that plaintiff must in his pleadings allege that defendants acted with "malicious intention" in order to proceed with a claim that immunity should be denied on the subjective criterion, *Halperin v. Kissinger, supra,* at ——, n. 119, 606 F.2d at 1209, n. 119; citing *Procunier v. Navarette, supra,* 434 U.S. at 561, 98 S.Ct. 855 (1978). *Procunier* had indicated that "malicious intent" contemplated that the actor intend the consequences of his action. Where the claim against the actor was grounded in negligence, a charge of malicious intent to harm could not be implied, the Court concluded, *id.* at 566, 98 S.Ct. 855.

*Butz, Procunier* and *Halperin* all make clear that defendants are not required affirmatively to establish their good faith until plaintiff has met his burden of alleging and proffering evidence of bad faith under either the objective or subjective criterion.

24. *The Objective Criterion.* Under the first prong of the *Economou-Halperin* test, the Court reaffirms Judge Jones' conclusion as to the reasonableness of defendants' conduct seen from the perspective of January, 1973, and the understanding of the law at that time; Findings of Fact 66, *supra.* The Court has concluded that at that time the law as applied to the circumstances of this case was uncertain. Analogous to *Procunier v. Navarette, supra,* while plaintiff's general First Amendment rights were well established, the exercise of those rights and the procedural terms for restricting those rights in the unique context of the White House vicinity on Inaugural Day were not clear in 1973; *see Procunier v. Navarette,*

*supra.* This conclusion as to uncertainty is supported by (a) the apparent certainty of the Inauguration legislation and regulations, and the extraordinary and necessary concern both for pedestrian and vehicle control and protection of the President on Inaugural Day, (b) the ambiguity of *Quaker Action* at that time, in terms of its application to Inaugural Day, and (c) the state of the First Amendment law applied to competing interests on federal lands, as revealed by *Women Strike for Peace v. Morton,* 153 U.S.App.D.C. 198, 472 F.2d 1273 (D.C.Cir.1972). This background supports a conclusion that it was reasonable albeit erroneous to believe that arrangements for expressive conduct in the White House vicinity on other days were inapplicable. It was similarly reasonable to conclude that the presence of demonstrators on the White House sidewalk at that time would "impos[e] an especially severe burden on" the countervailing interests here, security arrangements and crowd control, *Women Strike for Peace, supra* 153 U.S.App.D.C. at 223, 472 F.2d at 1298, on an occasion when the President would be physically present near large numbers of people at well-known times and locations, and reasonable to conclude that the only regulations necessary were those they had: that only individuals with valid tickets could be admitted to the various controlled locations. After *Quaker Action IV* or in any event after the instant decision becomes final such conclusion is no longer reasonable, *see* Conclusions of Law 3, 6, 8, *supra.*

(a) The uncertain state of the law is apparent first from the relative certainty of the Inauguration legislation and regulations. Nothing in the Act or regulations suggested that the Act was not the exclusive legislation governing the White House vicinity in the January 15–25 period;

(b) Nor did the *Quaker Action* litigation at that time clarify the state of the law, or undermine the reasonableness of reliance on the Inaugural Day regulations. As found above, *Quaker Action* appeared to govern the general situation of demonstrations near the White House, whereas the Act dealt with the extraordinary conditions of Inaugural Day. *Quaker Action* makes no mention of Inaugural Day and the overriding principles which governed expressive conduct on federal lands were not clearly articulated until *Quaker Action IV, supra.* Findings of Fact 29, *supra.*

(c) *Women Strike for Peace v. Morton, supra,* further illustrates the uncertainty inherent in applying to a specific situation the First Amendment "rules" developed in numerous Supreme Court cases, rules which "must be recognized and utilized for what they are: a group of useful aids derived from the community's admittedly vague sense of what might be called First Amendment etiquette." *Id.* 153 U.S.App.D.C. at 211, 472 F.2d at 1286 (Wright, J.) The case dealt with the efforts of an antiwar group ("WSP") to erect temporary displays on the Ellipse. After several stages of litigation, the Court of Appeals affirmed a decision granting relief to allow the WSP to erect its display, but refusing to invalidate regulations promulgated by the Interior Department to regulate expressive conduct on the Ellipse. Separate and lengthy opinions were filed by Judges Wright and Leventhal. Judge Robb joined in the conclusions reached by Judge Leventhal. Judge Wright's approach recognized that the issue was "the amount of inimical conduct the state must tolerate in the interest of allowing free communication." In weighing the societal costs against the restriction of expressive conduct, he concluded that there could be no "nexus" between the "erection of the WSP display and invasion of substantial governmental interests" and that the regulations were therefore invalid. *Id.* 153 U.S.App.D.C. at 214, 472 F.2d at 1289.

Judge Leventhal, on the other hand, was unwilling to adopt what he characterized as a "more or less explicit interest-balancing theory." *Id.* 153 U.S.App.D.C. at 223, 472 F.2d at 1298. He concluded that there was no basis for denying the

> possibility of a nexus between structures on park land and governmental interest in serenity of park use. . . . The point is, however, that a regulation vindi-

cating the nexus must be narrowly drawn, with articulated criteria, to avoid the possibility of censorship. . . . I might further conclude that a regulation might validly prohibit all display structures, as imposing especially severe burdens on park values.

Communicative activity on park land . . . is nonetheless only one of a number of interests that must be accommodated in a proper system of park governance, social, cultural and recreational.

*Id.* 153 U.S.App.D.C. at 223–24, 472 F.2d at 1298–99.

25. *The Subjective Criterion.* Warned to be alert to the possibility of "artful pleading" when dealing with the subjective basis for defeating the immunity defense, *Butz v. Economou, supra,* 438 U.S. at 506, 98 S.Ct. 2894, and noting this Circuit's recognition of the importance of summary judgment procedures in suits such as this, *Halperin v. Kissinger, supra,* at 302, 606 F.2d at 1209, and at 307–308, 606 F.2d at 1214-1215 (Gesell, J., concurring), the Court has carefully considered whether plaintiff has sufficiently alleged malicious intent or raised a genuine issue of material fact as to such intent or good faith on the part of the Park Service and D. C. defendants and defendant Rowley, so as to preclude summary judgment; *see* Findings of Fact 66–71, *supra.*

(a) Plaintiff nowhere specifically alleged malicious intent on the part of Park Service defendants, noting only that the possibility "cannot be dismissed," Findings of Fact 68, *supra.* And plaintiff proffers no evidence which, if proven, would establish malicious intent. Plaintiff's reference to a rumor that plaintiff was hostile toward police is simply irrelevant or, if relevant, requires a chain of inferences which have been neither articulated nor supported. Plaintiff appears also to argue that malicious intent may be inferred from the fact that a group was permitted to demonstrate at another location on Inaugural Day. Viewing the evidence in the light most favorable to plaintiff, neither of these contentions would permit a reasonable man to infer bad faith

conduct on the part of defendants with respect to Saffron. Given the lack both of clear allegation and of proffered evidence about bad faith conduct toward plaintiff, he Court has concluded that plaintiff's allegations are both artful and insubstantial and that no genuine issue of fact as to malicious intent on the part of any Park Police defendants exists.

(b) As to defendant Rowley, plaintiff does not even allege malicious intention. Plaintiff never suggests that "indiscriminate antipathy," Findings of Fact 69, *supra,* is the equivalent of such intention. While plaintiff proffers no evidence for his claim of indiscriminate antipathy toward demonstrators, evidence of such antipathy, if not entirely irrelevant, is of little probative value in establishing defendant's intent with respect to this plaintiff. Moreover, plaintiff concedes that his action is based entirely upon negligence, Findings of Fact 70, *supra.* Such a claim precludes the possibility of malice, *Procunier v. Navarette, supra,* 434 U.S. at 566, 98 S.Ct. 855; *Halperin v. Kissinger, supra,* 196 U.S.App.D.C. at 302, n. 119, 606 F.2d at 1209, n. 119.

(c) Having concluded that the state of the law in 1973 was such that defendants' conduct in seeking to exclude plaintiff on Inaugural Day was objectively reasonable, there remains nothing in plaintiff's papers dealing with the District of Columbia defendant Wilson which alleges subjective bad faith or malice and no proffer of evidence which might permit a reasonable inference of such attitudes. As to officers McKnight and Mann, the conclusion above that Mann's arrest of plaintiff was proper removes any basis for liability for false arrest or for bad faith in connection with the arrest.

(d) As noted earlier, participation by specific Secret Service officers has never been definitely established. While no conclusion as to their immunity can be reached on this record, the absolute bar of the statute of limitations, analyzed below, obviates the need to reach the issue of immunity as to them.

(e) For these reasons the Court has granted summary judgment on the basis of immunity to defendants Wright, Dickenson, Beye, Hill, Lindsey, Herbert, Brady, Niedringhaus, Burdick, Wilson, Mann, McKnight and Rowley.[1]

## IV. STATUTE OF LIMITATIONS DEFENSE OF SECRET SERVICE INDIVIDUALS

### A. *Findings of Fact*

73. Assuming that Secret Service agents were involved, the event on which their liability may be based occurred on January 20, 1973.

74. Plaintiff's original complaint was filed on January 16, 1974, and attributes no responsibility to the Secret Service or its agents.

75. Plaintiff filed a First Amended Complaint in April 1975, naming at that time as defendants Secret Service Director Rowley and Roe and Doe, the former described as the agent who required that plaintiff be removed from the area where he was picketing in front of the White House, and the latter as a supervisor in the chain of command devolving from Rowley to Roe.

76. In May 1978, plaintiff filed a Second Amended Complaint, deleting defendant Doe and adding eight Secret Service agents —Rundle, Burke, Towns, Jones, Shanahan, Evans, McLeod and Lau. Plaintiff now sought to sue what he understood to be the entire chain of command from Rowley to Roe.

77. None of the eight additional defendants received notice of this suit before June 1977. The affidavits of defendants reveal that they received notice in 1977 and 1978— Lau (January 1978); Shanahan (January 1978); Burke (January 1978); Evans (June 1977); Rundle (June 1977); Towns (May 1978); Jones (May 1978); McLeod (February 1978). Plaintiff's allegations as to Jones and McLeod attribute knowledge to them in January 1978 and July 1977 respectively. Even if correct, however, such knowledge is subsequent to January 20, 1976. Plaintiff's allegations with respect to Towns go only to his knowledge of plaintiff; there is nothing beyond mere speculation to suggest knowledge of the lawsuit prior to May 1978.

78. Plaintiff has alleged that since discovery was begun after April 1975, the Service has attempted to conceal the identity of the agents allegedly involved with plaintiff on Inaugural Day 1973. Plaintiff does not allege that, prior to the addition of the Service as a party in 1975, the Service or its agents did anything to conceal or violated any duty to reveal its alleged involvement in Saffron's removal and arrest on Inaugural Day, so as to prevent plaintiff from learning of that involvement.

79. In an attempt to determine which defendants, if any, were the Doe and Roe of the First Amended Complaint and whether, with respect to those defendants, plaintiff could establish compliance with the requirements of F.R.Civ.P. 15(c), the Court ordered an evidentiary hearing; Memorandum and Order of October 2, 1978.

80. At that hearing on November 6, 1978, parties had the opportunity to examine the Park Police defendants concerning the alleged involvement of Secret Service agents in Saffron's removal and arrest. Park Police defendants were shown photographs of agents who had been assigned to Lafayette Park on Inaugural Day.

81. None of the Park Police defendants could identify any Secret Service agent as having been involved in the incidents of that day. The only defendant to identify any Secret Service presence was Captain Hill, who testified that an agent expressed his concern about plaintiff's presence; Transcript of Proceedings of November 6, 1978; p. 79 and *passim.*

82. Plaintiff knew the identity of Park Police officers Hill and Herbert on January

---

1. The Court dismissed the action against decedent Lamb on the basis that it did not survive his death. It notes, however, that he would equally have been entitled to immunity based upon his good faith conduct, *see* Conclusions of Law 25, *supra.*

20, 1973; plaintiff knew of Herbert's report alleging involvement of a Secret Service agent as of January 17, 1975.

83. Plaintiff did not undertake to depose those officers until late 1976.

84. The evidentiary hearing of November 6, 1978, revealed strong evidence of fading memories on the parts of Herbert, Hill and the other Park Police officers as to incidents which had occurred over five years earlier.

### B. *Conclusions of Law*

29. The relevant statute of limitations is the three-year period provided by D.C.Code § 12–301(8); Memorandum and Order of October 2, 1978. Absent circumstances which tolled the Statute, it expired on January 20, 1976.

30. F.R.Civ.P. 15(c) sets forth the conditions under which, for the purposes of the statute of limitations, an amended complaint can relate back to the earlier pleading. Where the complaint seeks to charge the party against whom a claim is asserted, plaintiff must prove (1) that the claim asserted in the amended pleading arose out of the same conduct or occurrence set forth in the original pleading; (2) that within the statutory period of limitations, the newly-added party received such notice of the institution of the action that he would not be prejudiced in maintaining his defense of the merits; and (3) that within the statutory period of limitations, the newly-added party knew or should have known that "but for a mistake concerning the identity of the proper party" the action would have been brought against him.

31. Read into every federal statute of limitations, including the adoption of an analogous local statute of limitations, is the equitable doctrine that in case of defendant's fraud or deliberate concealment of material facts relating to his wrongdoing, time does not begin to run until plaintiff discover[ed], or by reasonable diligence could have discovered, the basis of the lawsuit.

*Fitzgerald v. Seamans*, 180 U.S.App.D.C. 75, 83, 553 F.2d 220, 228 (D.C.Cir.1977). Plaintiff's claim of fraudulent concealment here goes only to the period after the Service was made party to the suit through its director and the fictitious defendants and plaintiff undertook to ascertain the identity of those fictitious defendants. The concealment alleged here differs from concealment of the initial harm, particularly where the concealing party has a fiduciary duty toward the injured party; *Fitzgerald v. Seamans, supra*, 180 U.S.App.D.C. at 83 and n. 12, 553 F.2d at 228 and n. 12. Nonetheless if it were established that the Secret Service in fact acted to hide the identities of the agents involved, the statute of limitations might be tolled, most probably from the time plaintiff undertook efforts to identify Roe and Doe.

■ Aware of the problem of proving concealment, particularly where a necessarily close-knit organization is involved, and concerned with the harm to the larger public interest which would result if an agency of government were engaged in fraudulent concealment of facts which would reveal unconstitutional conduct on the part of its personnel, the Court has indulged generous presumptions in favor of plaintiff in dealing with his request for leave to file the Second Amended Complaint and in interpreting his pleadings; the Court also undertook to facilitate the discovery process by, among other things, a *sua sponte* order for evidentiary hearings. Despite the extensive discovery, including the evidentiary hearings, there remains no evidence to support the claim of fraudulent concealment. The Court has therefore rejected the claim and dealt with the situations presented by a three-year statute of limitations which expired in January 1976 and a Second Amended Complaint which added eight individual defendants in May 1978.

■ 32. Plaintiff fails to meet the second and third requirements of 15(c); Conclusions of Law 30, *supra*:

(2) Plaintiff has failed to show that within the statutory period of limitations, expiring January 30, 1976, the newly-added par-

ties received such notice of the institution of this action that they would not be prejudiced in maintaining their defense on the merits.

(a) The affidavits of defendants reveal that they did not receive notice of this suit until at the earliest June 1977; Findings of Fact 75, *supra*. Plaintiff's allegations with respect to Town are insufficient to suggest knowledge prior to May 1978; with respect to McLeod and Jones they are insufficient to suggest knowledge before July 1977 and January 1978 respectively; assuming the truth of those allegations, all three defendants still learned of the suit well after January 20, 1976; Findings of Fact 75, *supra*. It is notice of the lawsuit and not the underlying facts which are required by Rule 15(c); *see, e. g., Archuleta v. Duffy's Inc.*, 471 F.2d 33, 35–36 (10th Cir. 1973); *Craig v. United States*, 413 F.2d 854, 858 (9th Cir.), *cert. denied*, 396 U.S. 987, 90 S.Ct. 483, 24 L.Ed.2d 451 (1969).

(b) Plaintiff does not present, and the Court has not discovered any applicable basis in law to permit "constructive notice" to defendants under Rule 15(c); Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment at 18, n. 30 (filed September 14, 1978); Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss at 15–17 (filed December 20, 1978). However the notice is denominated, it must be such as to allow defendants to avoid prejudice in their defense. The record here reveals that defendants might have avoided prejudice only if, after receiving notice by January 1976, they had taken steps to depose plaintiff and, most crucially, the Park Police defendants. Even assuming defendants actually knew of a suit against Doe and Roe, since there is no evidence that these defendants intentionally concealed any facts, such knowledge could not make them fairly chargeable, as reasonable and prudent individuals, with a duty to undertake such steps. *A fortiori*, notice they know nothing of, such as notice to their employer or other Secret Service personnel, cannot under these circumstances constitute "such notice . . . that [they] will not be prejudiced in maintaining [their] defense on the merits . . .."; Rule 15(c).

Beyond having received no notice which would have allowed them to avoid prejudice, defendants have in fact been measurably prejudiced by the passage of time, as evidenced, for example, by the evidentiary hearing of November 6, 1978. The Court does not rely upon or make any final conclusions as to the delinquency of plaintiff's counsel. The Court must note, however, that plaintiff's delay of almost two years in deposing Park Police defendants Hill and Herbert, after learning of possible Secret Service involvement, is a key element in evaluation of that prejudice. Nor does the Court rely upon or make any final conclusions as to the duty of the Secret Service to investigate the events of Inaugural Day relating to plaintiff or their compliance with that duty, beyond its conclusion that the record is bare of any evidence of fraudulent concealment by the individual defendants which would justify either tolling the statute or applying an exception to Rule 15(c).

(3) Defendants did not know and are not chargeable with knowing that "but for a mistake concerning the identity of the proper party, the action would have been brought against [them]." Rule 15(c)(2) contemplates the substitution of one party for another. Assuming *arguendo* that fictitious defendants may constitute defendants for whom others may be substituted under that rule (and concomitantly assuming away a host of problems as to the meaning of "mistake" under 15(c)), plaintiff's failure to establish any connection between Doe and the eight individual defendants requires the Court to characterize the Second Amended Complaint as adding eight new defendants rather than substituting them for Doe. That failure also requires the conclusion that defendants did not know and were not chargeable with knowing that but for a mistake they would have been parties to the suit.

33. In light of the public importance of careful evaluation of claims of concealment

on the part of government defendants and on the record at that time, the Court concluded that plaintiff's allegations were sufficient to warrant permission to file a Second Amended Complaint. The disposition of defendants' statute of limitations claim makes reconsideration of the leave to file academic. Two factors—plaintiff's failure to make a case of fraudulent concealment, and the now clear record of prejudice to defendants in maintaining a defense—would today favor a different outcome under the standards prescribed by Rule 15(a).

34. Based upon consideration of defendants' affidavits, depositions of numerous parties, representations of counsel and the evidence from the hearing of November 6, 1978, the Court's decision obviously rests upon a factual record in addition to the pleadings. *See, e. g. Simmons v. Fenton,* 480 F.2d 133, 137 (7th Cir. 1973); *Archuleta v. Duffy's Inc., supra; Craig v. United States, supra.* The Court concludes that defendants were properly entitled to entry of summary judgment on their behalf.

### ORDER AND JUDGMENT

It is hereby ADJUDGED and DECLARED that:

Defendants' removal of plaintiff from the White House sidewalk on Inaugural Day 1973 constituted an unconstitutional invasion of his First Amendment rights of free expression; and

Plaintiff is entitled to exercise his First Amendment rights in the White House vicinity on Inaugural Days, free from the threat of arbitrary and capricious interference by defendants, and subject to restriction only pursuant to narrowly-drawn regulations that specify objective criteria, which regulations permit adequate time for judicial review of any restriction imposed (except under emergency conditions), and which regulations satisfy the standards enunciated in *A Quaker Action Group v. Morton,* 170 U.S.App.D.C. 124, 516 F.2d 717 (D.C.Cir. 1975); and it is hereby ORDERED, ADJUDGED AND DECREED that:

The Court shall retain jurisdiction of this action, in an inactive status, in order to entertain motions for further relief as may be necessitated by any failure by defendants timely to adopt constitutionally valid regulations as part of their planning for future Inaugural Days or for any other such relief as may become necessary; and it is

FURTHER ORDERED: That on or before September 30, 1979 either party may move or otherwise plead with respect to any contention either wishes to make or press with respect to possible sanctions indicated by the conduct of any party during the proceedings.